# Burton's Appeal.

1. The right of alienation is an incident of ownership and belongs to a corporation as well as to an individual, when no restraint is imposed in the charter.

2. Conversion is not destruction and can be made for the benefit of the trust. There is no solid objection to the change of church property, so long as its true purpose is preserved.

3. A sale is often the best mode of executing a trust.

4. An authority conferred by law to sell for the benefit of the congregation would impair no contract and violate no law.

5. The intention of the Act of 18th April 1853 (Real Estate) is to loosen real estate, whether bound by the disabilities of persons, the limitations of contingent interests or restrictions to limited uses, and to preserve to every interest its proper share in the result. It is beneficent and remedial and not to be construed so as to defeat its main intent.

6. Where there is no immunity from sale intended as a protection to the estate itself and there is but a mere want of power in the person who holds it and no independent interest would suffer by the conversion, the Act of 1853 intended to authorize the court to order a sale.

7. The charter of "The Ministers, Vestrymen and Churchwardens of the German Lutheran Congregation in and near the City of Philadelphia," construed.

February 11th 1868. Before THOMPSON, C. J., STRONG, AGNEW and SHARSWOOD, JJ. READ, J., at Nisi Prius.

Appeal from decree of the Court of Common Pleas of *Philadelphia*: In Equity: No. 133, to January Term 1868.

On the 14th of October 1865, "The Ministers, Vestrymen and Churchwardens of the German Lutheran Congregation in and near the City of Philadelphia," petitioned the court, setting forth that they were owners in fee of certain real estate described in the petition, and that they were much in debt, and prayed for a decree, that they might sell the real estate, or let it on ground-rent, to pay the debts of the congregation, and for other purposes stated in the petition. The petition was referred to an examiner

to take testimony and report upon it.   The examiner reported, that upon the merits the prayer should be granted; but that under a prohibitory clause in the charter, and the Act of 1853, "relating to the sale and conveyance of real estate," a sale could not be decreed.   Exceptions were filed to this report, both by the petitioners and the contestants.   On the 14th of July 1866, the court directed the corporation of the congregation to call a general meeting of the congregation, to hold an election to determine whether a sale should take place; notice of the election to be given as specified in the order of the court.

On the 8th of March 1867, the president of the corporation reported to the court, that after notice as directed in the order, an election had been held on the 31st of July 1866, which resulted as follows :—

    1st.  For the sale of property on Eighth street,   460 votes.
        Against the sale,   .   .   .   .   .   79   "
    2d.  For the sale of property at Fourth and
        Cherry streets,   .   .   .   .   .   121 votes.
        Against the sale,   .   .   .   .   .   406   "
    3d.  For the sale of houses and lots on Fourth
        street, and on Cherry street, &c.,   .   .   439 votes.
        Against the sale,   .   .   .   .   .   99   "

Whereupon the court, June 7th 1867, ordered a sale of the houses and lots (amongst others) on Fourth street.   They were accordingly sold on the 31st of July 1867 to Henry Burton, for $36,000.

On the 5th of October then next, Mr. Burton petitioned the Court of Common Pleas, setting forth the foregoing facts, and that he was informed and believed that there were of the congregation about 1500 qualified voters, and that the congregation were unable to make a good title, because 1. The corporation was forbidden by its charter from granting, aliening or otherwise disposing of their property; and, 2. If such sale could be authorized, that there was not sufficient evidence of any proper corporate meeting for the purpose; or that a requisite majority of the 1500 voters had been duly obtained.   He prayed that the sale might be set aside, and he relieved of his bid.

The congregation filed an answer on the 26th of the same month, in which they admitted the sale, &c., and alleged that all German congregations in and near Philadelphia, were not incorporated, but that only the ministers, twelve vestrymen, and nine elders constituted the corporation; that the restriction against alienation applied only to these, and not to the congregation, or to the title held for the congregation by the corporation; that a majority of two-thirds of those entitled to vote had voted for the sale; and that the meetings were regular and valid.

The court, on the 2d of November 1867, dismissed Burton's

petition and confirmed the sale; which, upon his appeal to the Supreme Court, he assigned for error.

The facts of the case not specified above, appear to be these:— At and before the 25th of September 1765, a number of persons members of the German Lutheran Congregation, living in and near Philadelphia, owned four lots of ground, on which they had erected St. Michael's Church, a school-house and a parsonage, and had set apart the remainder for a burial-place and other public uses of the congregation. On that day Thomas Penn and Richard Penn created the then rector, churchwardens and vestrymen, naming them, a corporation, by the name of "The Rector, Vestrymen and Churchwardens of the German Lutheran Congregation, in and near the city of Philadelphia." The charter authorized "the said Rector, Vestrymen and Churchwardens, and their successors, by the name aforesaid," to purchase and hold land, to receive moneys and personal estate to be laid out in the purchase of land. It required the rector, vestrymen and churchwardens, and their successors, from time to time to apply their rents and revenues for the support of the rector, ministers and officers, for putting and keeping in order the burying-ground and houses; for supporting one church more in Philadelphia and the Liberties; and "the said rents, revenues or other estate of the said corporation, shall not be appropriated to any other use or purpose whatsoever."

The charter contained this further provision: "And we do further will and require that the said rector, vestrymen and churchwardens, and their successors, shall not by deed, fine or recovery, or by any other ways or means, grant, alien or otherwise dispose of any manors, messuages, lands, tenements or hereditaments, in them and their successors to be vested, nor charge or encumber the same to any person or persons whomsoever."

By an Act of Assembly of March 3d 1780, the charter was amended, and the corporation confirmed by the title of "The Ministers, Vestrymen and Churchwardens of the German Lutheran Congregation in and near the city of Philadelphia, in the State of Pennsylvania." The act also provided that the fundamental articles in the charter "shall be and remain and continue for ever, valid and effectual, unless the same be altered by the consent of two-thirds parts in number of the members of the said congregation, qualified to vote at elections according to the purport and meaning of the said charter and of this act."

Various Acts of Assembly from 1813 to 1851 authorized the corporation to sell certain lands in Northumberland county, to lease on ground-rent part of their land for the purpose of establishing a free school, to convert a certain ground-rent for the purpose of paying the debts of the congregation; to sell the burying-ground at Fifth and Cherry streets. The last act repealed all

[Burton's Appeal.]

the provisions of the charter, "*so far as the said burial-ground is concerned.*"

*H. Wharton* argued for the appellant, and cited the original charter and the Acts of Assembly above referred to ; also, Weckerly *v.* Lutheran Congregation, 3 Rawle 181; Commonwealth *v.* Woelper, 3 S. & R. 30 ; Weckerly *v.* Geyer, 11 Id. 35 ; Grant on Corporations (80 Law Lib.) 129–139 ; Finch's Law 84 ; Co. Litt. 224, a. ; Com. Dig. *Cond.* D. 6 ; Act of February 6th 1731, 1 Dall. L., Hall & Sellers 168 ; St. Mary's Church Case, 6 S. & R. 498 ; s. c. 7 Id. 517 ; R. *v.* May, 5 Burrows 2681; R. *v.* Faversham, 8 T. R. 352 ; R. *v.* Theodorick, 8 East 543 ; R. *v.* Gaborian, 11 Id. 86, note; Smyth *v.* Darley, 2 H. Lds. Cas. 803 ; Stowe *v.* Wyse, 7 Conn. 219 ; Savings Bank *v.* Davis, 8 Id. 191 ; Bethany *v.* Sperry, 10 Id. 200 ; Wiggin *v.* Baptist Church, 8 Metc. 301 ; People *v.* Batchelor, 22 N. Y. 128 ; Wilcock on Corp., §§ 64, 65; Act of April 18th 1853, Pamph. L. 503, Purd. 851.

*E. K. Price* (with whom was *D. Webster*), for appellee, cited Griffiths *v.* Cope, 5 Harris 96 ; Brown *v.* Lutheran Cong., 11 Id. 499 ; Brendle *v.* German Ref. Cong., 9 Casey 415 ; Hill on Trustees 278 ; Witman *v.* Lex, 17 S. & R. 91 ; Meth. Ch. *v.* Remington, 1 Watts 218 ; Unangst *v.* Shortz, 5 Wh. 519 ; Zimmerman *v.* Anders, 6 W. & S. 218 ; Pickering *v.* Shotwell, 10 Barr 23 ; McGill *v.* Brown, Brightly Rep. 347, 410, note ; Binney's Arg't. Girard Will Case 174 ; Evangl. Assoc's Appl., 11 Casey 316 ; 3 Dall. St. Laws 46, 659 ; Barr *v.* Weld, 12 Harris 84 ; Act of 1731, 1 Sm. Laws 192 ; Baptist Ass'n *v.* Hart, 4 Wheat. 35 ; Hillyard *v.* Miller, 10 Barr 326 ; Episcopal Ch. Soc. *v.* Episcopal Church, 1 Pick. 372 ; Gordon *v.* Preston, 1 Watts 387 ; 1 Bl. Com. 472 ; 2 Danv. Abr. 214 ; 1 Rol. 513, 515, 1, 10 ; Sutton's Hospital, 10 Rep. 290, 300 ; 1 Sid. 291 ; 22d Ed. 4, *Graunts ;* Shelford on Mortmain 672 ; 37 Law Lib. 460 ; Banker's Case, Skinn. 602 ; Co. Litt. 98, 99 ; Vaugh. 356 ; Act of April 1853, *supra ;* Grenawalt's Appeal, 1 Wright 95 ; Gilmore *v.* Rodgers, 5 Id. 128 ; Smith *v.* Townsend, 8 Casey 442 ; Clymer *v.* Norris, 2 Barr 277 ; Ervine's Appeal, 4 Harris 256 ; Pickle *v.* McKissick, 9 Id. 232 ; City *v.* Amer. Phil. Soc., 6 Wright 9 ; Commonwealth *v.* McDonald, 16 S. & R. 400 ; Commissioners of Spring Garden *v.* Northern Liberties, 1 Whart. 25 : Commonwealth *v.* Alburger, Id. 469 ; Delany *v.* Gault, 6 Casey 68 ; Painter *v.* Henderson, 7 Barr 48, 52 ; Snyder *v.* Markel, 8 Watts 418 ; Lair *v.* Hunsicker, 4 Casey 115 ; Dixey *v.* Laning, 13 Wright 143 ; Angell & Ames on Corp., §§ 487, 497, 513.

The opinion of the court was delivered, February 20th 1868, by

[Burton's Appeal.]

AGNEW, J.—It seems to be proper to obtain a correct view of the nature and capacity of the body known as the German Lutheran congregation, in and near the city of Philadelphia, in order to learn the relation and powers of the corporation created to take charge of its interests and property. This congregation had an existence in the year 1762, and how long before we are not informed. We find it on the 18th of October of that year entering into fundamental articles for its proper organization and government. The first charter of incorporation was granted by Thomas and Richard Penn, proprietors of the province of Pennsylvania, and of the counties of New Castle, Kent and Sussex, in Delaware, by letters patent, issued by John Penn, Esq., lieutenant-governor, on the 25th of September 1765. The corporation consisted of the rector, vestrymen and churchwardens only, but the charter was founded upon the fundamental articles of the congregation, and granted wholly for its benefit. This charter was renewed by the legislature of the Commonwealth with a few minor changes, including the title of the corporation which became that of "The ministers, vestrymen and churchwardens of the German Lutheran congregation in and near the city of Philadelphia, in the state of Pennsylvania." The date of renewal is the 3d of March 1780. The corporation is called the "church council" in the fundamental articles, and consists of the ministers, twelve vestrymen and nine churchwardens, duly chosen by the congregation, under the provisions of the fundamental articles. It is obvious, from the recital in the preamble to the original charter, and from the provisions of both the old and new, that the incorporation of the church council is merely subsidiary to the interests of the congregation. Though it be the proper body politic, yet the corporation gathers around it only as a nucleus to direct their motion, and it cannot live or perpetuate its existence without that life-giving power. All of its functions are to be exercised, says the charter, "in the execution of the wholesome ordinances" of its fundamental articles, for the "orderly and good government of the church" and for the "management and preservation of its property." It is to leave, say the articles, "without exception, the *trusteeship, according to the country's custom*, of all that which is intrusted to it as a corporation," &c. The congregation is, therefore, the true owner of the property, while the corporation holds but the bare legal title. As a religious body, it falls within the kindly care of the state. From the earliest history of the province these bodies have been held in the greatest regard as tending, in the language of the charter, to form "good Christians, faithful subjects and useful and peaceful members of the government under which they live," and have been invested as quasi corporations with the right to acquire and hold property as the means of promoting these praiseworthy objects: Witman *v.* Lex, 17 S. & R. 93; Methodist

[Burton's Appeal.]

Church *v.* Remington, 1 Watts 224; Martin *v.* McCord, 5 Watts 493; Unangst *v.* Shortz, 5 Whart. 519; Phipps *v.* Jones, 8 Harris 263; Zimmerman *v.* Anders, 6 W. & S. 218; Pickering *v.* Shotwell, 10 Barr 23; Price *v.* Maxwell, 4 Casey 34, 35; Evangelical Association's Appeal, 11 Casey 316.

In the absence of a charter of incorporation, it is very clear that the individuals composing the congregation would as natural persons be competent to convey their property; or if there be trustees in whom it is vested, they and the individuals constituting the congregation could convey: Brown *v.* Lutheran Church, 11 Harris 495; Brendle *v.* German Reformed Congregation, 9 Casey 425; Griffitts *v.* Cope, 5 Harris 96.

The right of alienation is an incident of ownership, and belongs to a corporation as well as to an individual, when no restraint is imposed in the charter: Dana *v.* Bank of United States, 5 W. & S. 243; Sutton's Hospital, 10 Coke R. 30; Angell and Ames on Corp. § 188; Walker *v.* Vincent, 7 Harris 369. This right is not restrained by any state policy. On the contrary, free and unrestrained commerce in property, real and personal, has always been regarded as a favorite doctrine. There is no good reason why a perpetual restraint should be placed upon the alienation of the estate of religious societies. That which is suited to the present, by a change of times becomes unfit for the future. The unpretending church or modest parsonage, or primitive schoolhouse of a village or borough town becomes unsuited to the growth, situation and progress of taste and culture of a large city. The ground itself often becomes the most valuable possession, and by a sale may add greatly to the welfare of the body, enabling it to erect finer edifices, better adapted to the change of times and circumstances. Conversion is not destruction, and can be made for the benefit of the trust. No solid objection lies to the change of church property so long as its true purpose is preserved. This is the doctrine of the state: Griffitts *v.* Cope, 5 Harris 96; Brendle *v.* Congregation, 9 Casey 425; Barr *v.* Weld, 12 Harris 84; Kerlin *v.* Campbell, 3 Harris 500; Brown *v.* Lutheran Church, 11 Harris 495.

A sale is frequently the best mode of executing the trust. With these observations upon the nature and capacity of the congregations, the true owner of the property in this case, we cannot fail to perceive, that the restraint upon alienation imposed by the charter in the church council or corporation was made for the protection of the interests of the church body. The disability inheres solely in the legal entity called the corporation, and not in the nature of the estate or the character of the church body. It is, therefore, capable of removal by the legislative will, whether expressed in a special or general act. An authority to sell for

the benefit of the congregation conferred by law, would impair no contract and violate no law.

This brings us to inquire into the power granted by the legislature in the Act of 18th April 1853, to the courts to decree a sale of church property. Its design is well expressed in the preamble of the act, to make *real estate* freely alienable and productive to the *living* owners thereof. Though not unmindful of the future, and of the duty owing to posterity, the special interests of society belong to the men of to-day, rather than to those of another generation. The intention of this law is manifestly to untie the cords which fetter the real estate of the Commonwealth, whether bound around it by the disabilities of persons, the limitations of contingent interests, or by restrictions to limited uses and purposes, and at the same time to preserve to every interest its proper share in the result. The law being beneficent and remedial, is not to be so construed as to defeat its main intent. Such has been the expression of opinion by this court in its favor: Smith *v.* Townsend, 8 Casey 442; Gilmore *v.* Rodgers, 5 Wright 128.

The Act of April 18th 1853, contains apt words to embrace this case. "Such sale, mortgaging, leasing or conveying upon ground-rent may be decreed, whenever real estate shall be held" "for religious, beneficial and charitable societies or associations, incorporated or unincorporated," "and generally in all cases where estates have been or shall be devised or granted in trust, or for special or limited purposes, or where any party interested therein is under a legal disability to sell and convey the same." The committee who framed this law say, in their report (p. 9), that the bill contains "a general power intended to cover all cases of trust or powers, and wherever any party in interest is under any legal disability." The property in this case is held in trust for a religious society or association, and for special or limited purposes, and the church corporation, the trustee, is under a legal disability to sell and convey. The restraint upon alienation imposed by the charter upon the church council is but a disability of the trustee and not of the congregation, as we have seen, excepting in so far as the possession of the legal title by the council, and the want of it by the congregation, together with the number and fluctuations in its membership, operate as a practical disability on part of the body. The really effective disability lies in the church council alone. This disability falls within the terms of the law and its spirit and intent, and is therefore capable of removal by the decree of the court, unless the case comes within the language and intent of the proviso to the first section. The court "shall have jurisdiction to decree the sale," &c. "Provided that the same may be done without the *violation of any law* which may confer *an immunity or exemption from sale or alienation*."

Unquestionably the charter is a law, and prohibits alienation

by the church council, but does it confer an immunity or exemption from sale? The stress of the appellant's argument lies in this proviso, but we think it misses its true meaning. The language is, any *law*, not any statute. If any law, which restrains the power to sell, is a barrier to the exercise of the power of the court, the proviso nullifies the act; for it was because the law refused permission to sell to infants, lunatics, trustees and others under a legal disabilty to sell, that the authority was given to the courts to decree a sale. It cannot be therefore a mere want of the power of alienation, a simple disability to sell, that the proviso was intended to cover. But an immunity or exemption from sale or alienation has a meaning, and it is important to protect certain interests. Immunity or exemption from sale is not logically predicable of a person, but it is of a thing. It cannot be said of the owner that he is free from alienation, but his property may be exempt. It is therefore the real estate itself which is the subject of the proviso. It is that which possesses the immunity.

But is this a wise distinction? To be so it must have some valuable purpose; and this is easily discovered. There are many cases where some use, purpose or trust lies at the foundation of the grant of title, and where a diversion from the intent of the donor will cause the estate to revert; or where, by some act of law, by the exercise of public power, rights are acquired co-existent only with a purpose or use to which the property is devoted; and some where by contract and the sanction of a statute an estate is incapable of being divested.

Instances may be found in grants for special and exclusive uses, as for churches, schools, hospitals, &c., and for public purposes, as railroad tracks, public streets and squares, and others, which will occur to the professional mind. Some of them can be seen in the following cases: McKissick *v.* Pickle, 4 Harris 140; s. c., 9 Id. 232; Western University *v.* Robinson, 12 S. & R. 29; Rung *v.* Schoneberger, 2 Watts 25; Commonwealth *v.* Rush, 2 Harris 193; Commonwealth *v.* McDonald, 16 S. & R. 390; Commonwealth *v.* Alburger, 1 Whart. 469. In all such cases the immunity or exemption inheres in the title or estate itself, involving rights which would conflict with the interest decreed to be sold, and would therefore be impaired by the sale. The proviso intends to protect these. But where there is no immunity from sale intended as a protection of the estate itself, and it is but a mere want of power in the person or party who holds it, and no independent interest would suffer by the conversion, the law intended to confer the power upon the court to order a sale. The Act of 1853, said the present Chief Justice, has great scope—all its provisions have perhaps not yet been called into active exercise. It unfetters the realty from diversity of titles and contingent interests, securing to the purchasers clear titles, and

to parties interested the value of their interests: Greenawalt's Appeal, 1 Wright 97, 100. The deeds of the property in this case not being set out for inspection, and no allegation of any restriction in the title being made, we have followed the argument founded upon the restraint imposed by the charter, and considered the case on that ground alone.

It is not necessary to go into an examination whether the requisite number of communicants voted upon the question of sale. The Act of 1853 authorizes the court to take jurisdiction upon the petition of any trustee or person interested. This was sufficient to call the powers of the court into action. The question of the propriety of the sale did not depend upon the vote of the congregation, but upon the judgment of the court. Yet the meeting called under the authority of the court to obtain an expression of the wishes of the congregation, and the large majority of votes cast in favor of the sale, were important facts, influencing the court in the exercise of its sound discretion. It satisfied the court that a very large majority of the congregation sanctioned the sale, although two-thirds of the whole number had not voted for the measure under the first section of the third chapter of the articles of the church. If the proceeding derived its effect only from the action of the congregation, this might be a fatal defect, but as it arises from the act of the court, and the operation of law upon a petition by an authorized party, the want of a two-thirds vote is not material to the vesting of title in the purchaser.

We are of the opinion, therefore, that the Court of Common Pleas did not exceed its authority in deciding and confirming the sale, and its orders and decree are therefore affirmed, with costs, to be paid by the appellant.