CHEW et al. v. FIRST PRESBYTERIAN CHURCH OF WILMINGTON, DEL., Inc., et al.

(District Court, D. Delaware. August 4, 1916.)

No. 344.

1. INJUNCTION ⟨⟩136(3) — PRELIMINARY INJUNCTION — GROUNDS — NATURE AND EXTENT OF INJURY.

The balance of convenience or hardship frequently is a factor of controlling importance in cases of substantial doubt existing at the time of granting or refusing a preliminary injunction; but the injunction should usually be granted, where its denial would result in irreparable injury to complainant, if ultimately successful in the suit.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 306; Dec. Dig. ⟨⟩136(3)].

2. PERPETUITIES ⟨⟩8(7)—RELIGIOUS OR CHARITABLE PURPOSES—LIMITATION OF BENEFICIARIES.

Lands may validly be dedicated in perpetuity for a religious or charitable use, although the enjoyment thereof may not extend to the public at large, but only to the limited portion included in a certain congregation or society, incorporated or unincorporated.

[Ed. Note.—For other cases, see Perpetuities, Cent. Dig. §§ 63, 64, 66; Dec. Dig. ⟨⟩8(7).]

3. CEMETERIES ⟨⟩13—GIFT TO RELIGIOUS SOCIETY—POWER TO SELL.

In 1737 the owner conveyed certain real estate in Wilmington, Del., in fee to the trustees, overseers, and elders of the Presbyterian Church and their successors, "for the use of a meeting house, burying ground, and such other pious uses forever." At that time the church was an unincorporated society, having no legal status, but in 1744 an act was passed which confirmed all prior grants for such purposes to Protestant societies, but only for the use of the same religious societies for whom they were first granted, "according to the true intent and meaning" of the grant. In 1787 another act made the trustees of the churches bodies corporate. A part of the property was set apart for a burying ground, and has been maintained as such ever since. There have been 1,000 or more interments

therein, although none in' very recent years. The grounds have been kept in good condition, with walks and trees, and there are monuments and a number of tombs thereon. In 1843 the church sold and conveyed to complainants' ancestor and to his heirs and assigns a lot in the cemetery, upon which an expensive monument has been built and a tomb, where such ancestor and other relatives of complainants are buried. *Held*: (1) That the original grant impressed upon the land a religious or pious use in perpetuity, and that defendant church, as successor to the original grantees, holds the title in trust for such use, and as against lot owners without power of alienation for secular uses, even under a subsequent general statute conferring power to convey property; (2) that the conveyance of the lot to complainants' ancestor vested him with title in fee, subject to such proper regulations as might be made for the government of the cemetery.

[Ed. Note.—For other cases, see Cemeteries, Cent. Dig. § 14; Dec. Dig. ⬤⟿13.]

**4. DEEDS ⬤⟿31—EXECUTION—ERROR IN NAME OF CORPORATION GRANTOR.**

A deed *held* not invalid because of its execution in the name of the "trustees of the First Presbyterian Church of the borough of Wilmington," instead of "the First Presbyterian Congregation of the borough of Wilmington," which was the true name; it appearing that the same church corporation was intended.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 60–63; Dec. Dig. ⬤⟿31.]

**5. VENDOR AND PURCHASER ⬤⟿235—RIGHTS OF PARTIES—BONA FIDE PURCHASER.**

One who has contracted for the purchase of land and made a very small payment of earnest money, the remainder to be paid on the furnishing of a good title by the vendor, is not protected as a bona fide purchaser.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 567–569, 571–576; Dec. Dig. ⬤⟿235.]

**6. EVIDENCE ⬤⟿372(3)—ANCIENT DOCUMENTS—PROOF OF EXECUTION.**

A deed to a cemetery lot more than 73 years old, shown to have been in proper custody, and under which the grantee and his successors have since used and improved the lot for burial purposes, proves itself as an ancient document.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1615; Dec. Dig. ⬤⟿372(3).]

**7. CEMETERIES ⬤⟿20—TITLE AND RIGHTS OF OWNERS OF LOTS—ENJOINING WRONGFUL TRESPASS.**

A court of equity at the instance of proper parties has power to restrain the threatened wrongful destruction or removal of tombs, vaults, monuments, or bodies from a cemetery, or wrongful injury thereto or to the burial premises.

[Ed. Note.—For other cases, see Cemeteries, Cent. Dig. § 22; Dec. Dig. ⬤⟿20.]

**8. COURTS ⬤⟿343—PARTIES—SUIT BY REPRESENTATIVE OF A CLASS.**

Under equity rule 38 (198 Fed. xxix, 115 C. C. A. xxix) one lot owner may maintain such a suit in behalf of himself and other owners, where the threatened injury affects all.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 915, 916, 919, 920; Dec. Dig. ⬤⟿343.]

In Equity. Suit by Emily Cleland Townsend Chew, Sidney Jordan, Ethel Jordan, Vincent Jordan, and Archie N. Jordan against the First Presbyterian Church of Wilmington, Del., Incorporated, and Arthur L. Bailey. On motion for preliminary injunction. Motion granted.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Robert G. Harman and George Lodge, both of Wilmington, Del., for complainant.

Andrew C. Gray, of Wilmington, Del., for defendant First Presbyterian Church.

John P. Nields, of Wilmington, Del., for defendant Bailey.

BRADFORD, District Judge. This is an application by Emily Cleland Townsend Chew and others, citizens of states other than Delaware, suing on behalf of themselves and others, for a preliminary injunction to restrain, until the further order of the court, the First Presbyterian Church of Wilmington, Delaware, Incorporated, a corporation of Delaware, from entering or in any way trespassing upon the burial lot or vault wherein the bodies of the relatives of the complainants are buried in the cemetery of the corporation defendant between Ninth, Tenth, Market and King Streets in Wilmington, for the purpose of removing or in any wise disturbing the bodies or the remains of the relatives of the complainants now buried in that lot or vault, and from removing the monument thereon erected, the coffin and vault therein placed and built, the tombstone, coping, fences and chains on or surrounding the same, and from mutilating, cutting, destroying or removing the trees, shrubbery, flowers and earth in and upon the same, and also from removing or disturbing all or any of the other bodies buried in the said cemetery and from removing or disturbing all or any of the other coffins, vaults, tombstones, monuments, copings, fences, trees, shrubbery, in and upon the said cemetery, and also from conveying to the defendant Arthur L. Bailey, of Wilmington, Delaware, or to any person or persons whomsoever, the whole or any part of that rectangular portion of the land of the corporation defendant having a front of ninety feet on Market Street and a front of ninety feet on King Street and extending along the southerly side of Tenth Street from the easterly side of Market Street to the westerly side of King Street, with the right, privilege and easement of the free passage of air and light over and upon a certain other rectangular portion of the said land adjoining the lot above described and having a front of fifteen feet on Market Street and a front of fifteen feet on King Street. It appears from the bill, affidavits and exhibits on which the application for a preliminary injunction is based that the corporation defendant intends, in consideration of the sum of $225,000, to sell and convey to Bailey, in fee and clear of incumbrances, if possible, the above described rectangular lot running from Market to King streets with a frontage of ninety feet on each street, and to grant to him an easement for the passage of light and air in the above described strip of land having a frontage of fifteen feet on each street; the same to be used for the erection and maintenance of a public library. Pursuant to this intention the corporation defendant prior to the filing of the bill commenced, and thereafter and until the awarding of a restraining order, continued, to remove tombstones, trees and shrubbery, and otherwise to dismantle the cemetery.

[1] The granting or withholding of a preliminary, in contradistinction to a perpetual or permanent, injunction calls for the exercise of

sound judicial discretion, regulated and controlled by certain principles peculiarly applicable to temporary injunctive relief, and so firmly established as to render unnecessary any discussion of the particular decisions on which they rest. Regard should be had to the nature of the controversy, the object for which the injunction is sought, and the comparative hardship or convenience to the respective parties involved in the awarding or denial of the injunction. The ultimate object of a preliminary injunction, preventive in its nature, is the preservation of the property or rights in controversy until the decision of the case on a full and final hearing upon the merits, or a dismissal of the bill for want of jurisdiction or other sufficient cause. The injunction is merely provisional. It does not, in a legal sense, finally conclude the rights of parties, whatever may be its practical operation under exceptional circumstances. In a doubtful case where the granting of the injunction would, on the assumption that the defendant ultimately will prevail, cause greater detriment to him than would, on a contrary assumption, be suffered by the complainant through its refusal, the injunction usually should be denied. But where, in a doubtful case, the denial of the injunction would, on the assumption that the complainant ultimately will prevail, result in greater detriment to him than would on the contrary assumption, be sustained by the defendant through its allowance, the injunction usually should be granted. The balance of convenience or hardship frequently ·is a factor of controlling importance in cases of substantial doubt existing at the time of granting or refusing the preliminary injunction. Such doubt may relate either to the facts or law of the case, or to both. Where the sole object for which a preliminary injunction is sought is the protection of property or the maintenance of the status quo until the question of right between the parties can be decided on final hearing the injunction properly may be allowed even though there be serious doubt of the ultimate success of the complainant. And especially is this true where a mistaken refusal to award the injunction will result in irreparable injury to him. Among the many cases in this and other courts in support of these principles are Russell v. Farley, 105 U. S. 433, 438, 26 L. Ed. 1060; City of Newton v. Levis, 79 Fed. 715, 25 C. C. A. 161; Glascott v. Lang, 3 Myl. & C. 451, 455; ·Hadden v. Dooley, 74 Fed. 429, 431, 20 C. C. A. 494; Great Western R. Co. v. Birmingham, etc., R. Co., 2 Phil. Ch. 597; Shrewsbury & Chester R. Co. v. Shrewsbury R. Co., 1 Sim. N. S. *410, *426, *427, *432; Denver & R. G. R. Co. v. United States, 124 Fed. 156, 59 C. C. A. 579; Buskirk v. King, 72 Fed. 22, 18 C. C. A. 418; Sanitary Reduction Works v. California Reduction Co. (C. C.) 94 Fed. 693; Southern Pac. Co. v. Earl, 82 Fed. 690, 27 C. C. A. 185; New Memphis Gas & Light Co. v. Memphis (C. C.) 72 Fed. 952; Indianapolis Gas Co. v. Indianapolis (C. C.) 82 Fed. 245; Georgia v. Brailsford, 2 Dall. 402, 1 L. Ed. 433; Gring v. Chesapeake & Delaware Canal Co. (C. C.) 129 Fed. 996; Hoy v. Altoona Midway Oil Co. (C. C.) 136 Fed. 483; Harriman v. Northern Securities Co. (C. C.) 132 Fed. 464; Wilmington City Ry. Co. v. Taylor (D. C.) 198 Fed. 159. Do or not these principles require the awarding of a preliminary injunction as prayed to maintain the status

quo and prevent irreparable injury should the complainants be right in their contention?

. The title of the corporation defendant to the cemetery was mediately acquired from Timothy Stidham who by deed dated December 30, 1737, conveyed in fee land including the same to James Chalmers and others, and their successors, the trustees, overseers and elders of the "Presbyterian Church," to have and to hold "for the use of a Meeting House, Burying Ground and such other pius uses forever" as they or a majority of them should "at any time hereafter see most fitting and convenient, and to no other use, intent or purpose whatsoever." At the time of the execution of the above-mentioned conveyance the "Presbyterian Church" was an unincorporated religious society. Nor was there then any authority vested in its trustees, overseers and elders enabling them in the absence of legislation,—which did not then exist,—to convert or erect themselves into a corporation.

[2] Stidham in and by his conveyance created and imposed upon the land therein described a valid charitable or pious use or trust in perpetuity. State v. Griffith, 2 Del. Ch. 392; Griffith v. State, 2 Del. Ch. 421; Doughten v. Vandever, 5 Del. Ch. 51; Beatty v. Kurtz, 2 Pet. 566, 7 L. Ed. 521; Hopkins v. Grimshaw, 165 U. S. 342, 17 Sup. Ct. 401, 41 L. Ed. 739. It is unnecessary to multiply citations in support of this proposition, as it is beyond controversy and, indeed, has been admitted by both of the defendants. In First Presbyterian Church of Wilmington, Delaware, Incorporated, v. Bailey, 97 Atl. 583, decided by the court of chancery of Delaware May 8, 1916, the complainant,— the corporation defendant here,—set forth in its bill the above mentioned deed from Stidham and averred that it, the complainant, "became and was and now is seized in fee and possessed of said lot or parcel of land * * * under and subject to the following religious uses and trusts * * * viz.: 'For the use of a Meeting House, Burying Ground and such other pius uses forever as to the said' First Presbyterian Church of Wilmington, Delaware, Incorporated, 'shall at any time hereafter see most fitting and convenient and to no other use, intent or purpose whatsoever.'" The uses and trusts thus admitted as in force at the date of the verification of the bill in that case, namely, April 25, 1916, are, with the exception of an immaterial clerical error and the substitution of the name of the church for the names of Chalmers and others, and their successors, trustees, overseers and elders of the Presbyterian Church, identical with those set forth in the deed from Stidham. Bailey in his answer to the bill in that case averred that "said lot, piece and parcel of land, together with the easement appurtenant thereto, was and still remains impressed with and subject to the religious uses and trusts set forth and contained in paragraph 1 and paragraph 5 of said bill of complaint"; that is to say, the uses or trusts set forth in the conveyance from Stidham. The fact that the general public was not the beneficiary of the trust or use created by Stidham is unimportant; for it has become so well settled as to require no citation of authority that lands may validly be dedicated in perpetuity for a pious or charitable use although the enjoyment thereof may not extend to the public at large, but only to

the limited portion of the public included in a certain congregation or society, incorporated or unincorporated.

[3] The significance, force and effect of the pious or charitable trust or use created and declared by Stidham with respect to the beneficiaries thereunder as against those constituting the agency or instrumentality through which the contemplated beneficent ends were intended to be accomplished, will hereinafter be considered with some particularity. Under and pursuant to that trust and use a meeting house now known as the Historical Society Building was erected in 1740 on the land conveyed by Stidham, and subsequently there was also erected thereon a church building now known as the First Presbyterian Church. With the exception of the two portions devoted respectively to the Historical Society Building and the First Presbyterian Church, all of the land conveyed by Stidham was pursuant to the trust appropriated to the use of and was used as a burying ground, and immemorially has been maintained by the grantees in the Stidham deed and their successors in title, including the corporation defendant, as a cemetery. The land so maintained for that purpose includes the larger part of that which the corporation defendant intends to convey in fee to Bailey as above stated and also the above-mentioned strip of land 15 feet wide in which it proposes to give an easement for the passage of light and air. There have been a thousand or more interments in the cemetery, the bodies still remaining buried therein, and it contains many burial lots, vaults, tombstones, monuments, copings, iron fences and other fixtures and ornaments appropriate to and customary in burying grounds. It also contains ornamental trees, shrubbery and flowers; and paths have been laid out, and the premises beautified and kept in good condition as a cemetery. Ever since the year 1843 the complainants, their ancestors and other relatives have held, cared for and maintained a burial lot 15 feet square, situate in the northerly portion of the cemetery and within 20 feet from the southerly side of Tenth Street. This lot contains a family vault known as the Nelson Cleland vault and one of the largest and most costly monuments in the cemetery. In the vault have been and remain buried the bodies of Nelson Cleland and Christiana Cleland, the grandfather and grandmother of the complainants, and of other relatives. The lot, with its monument and fixtures, has been preserved and kept in excellent condition and frequently visited by the complainants. The right and practice of burial in the family lot and vault by the complainants and their relatives have been agreed to and known and acquiesced in by the corporation defendant and its predecessors in title to the cemetery. The Cleland lot and vault are included in the land which the corporation defendant intends to sell and convey to Bailey.

At the time of the execution of the deed from Stidham there was no law in force in the three lower counties on Delaware providing for the incorporation and regulation of religious societies, nor was there then any statutory enactment defining or limiting their powers. It was not until more than six years later,—October 20, 1744,—that an act was passed, entitled "An Act for the enabling religious societies

of Protestants within this Government, to purchase lands for burying-grounds, churches, houses for worship, schools," etc.   1 Del. Laws 271.   Its preamble down to the enacting clause is as follows:

"Whereas sundry religious societies of people within this government, professing the Protestant religion, have, at their own respective costs and charges, purchased small pieces of land within this government, and thereon have erected churches, and other houses of religious worship, school-houses, and inclosed part of the same lands for burying-grounds; and whereas the said lands were purchased and paid for by the said respective societies in the name or names of persons, at that time being of, or professing themselves to be of the same religious persuasion with the societies who made use of the names of the said persons as trustees for and in behalf of the said societies; and whereas some of the said trustees, or their heirs, having afterwards changed their opinions, and joined themselves to other religious societies, of a different persuasion from the people by whom the said persons were at first intrusted, and, upon pretext of their having the fee-simple of the lands so purchased in their names vested in them, have, contrary to the true intent and meaning of the first grant, or gift, attempted (by granting away the said lands, houses of religious worship and burying-grounds) to deprive the society of people in possession of the same of the right and use of the said houses of worship and burying-grounds, to the great disquiet and uneasiness of many of the good people of this government; and others, being intrusted in the like manner, may hereafter do the same.   For remedy whereof, and for the better securing the several religious societies in the quiet and peaceable possession of their churches, houses of worship, school-houses, alms-houses, and burying-grounds within this government," etc.

## Section 2 provided as follows:

"That all gifts, grants, or bargains and sales, made of lands or tenements within this government, to any person or persons in trust for societies of Protestant churches, houses of religious worship, schools, alms-houses, and for burying-grounds, or for any of them, shall be, and are hereby ratified and confirmed to the person or persons to whom the same were sold, given, or granted, their heirs and assigns in trust, and not otherwise, but for the use of the same religious societies for whom they were at first so sold, given, granted, or purchased, according to the true intent and meaning of such gifts, grants, or bargains and sales; and that every sale, gift, grant, or devise of any such trustee or trustees, or any person or persons, in whose name or names the said lands for erecting churches, houses of religious worship, schools, alms-houses, or burying-grounds, within this government, were purchased, taken, or accepted, or the heirs or assigns of such trustees shall be, and are hereby declared to be for the sole use, benefit and behoof of the said respective societies, who have been in the peaceable possession of the same, for the space of seven years next before the first day of April in the year of our Lord one thousand seven hundred and forty-four, or for whose use the same were at first given, granted, or devised, and no other."

## Section 3 provided:

"That it shall and may be lawful to and for any religious societies of Protestants within this government, to purchase, take, and receive by gift, grant, or otherwise, for burying-grounds, erecting churches, houses of religious worship, schools and alms-houses, for any estate whatsoever, and to hold the same, for the uses aforesaid, of the lord of the fee by the accustomed rents."

## Section 4 contains the following proviso:

"That nothing in this act contained shall be deemed, taken, or construed, to enable any of the said religious societies of people, or any person or persons whatsoever, in trust for them, or to their use, to purchase, take, or receive, any lands or tenements by gift, grant, or otherwise, for or towards the maintenance or support of the said churches, houses of worship, schools, or alms-hous-

237 F.—15

es, or the people belonging to the same, or for any other use or purpose, save for the uses in this act before mentioned."

The deed from Stidham was not executed under or pursuant to the act of 1744 for the simple reason that, as already stated, the statute did not come into existence until over six years afterwards. A valid charitable or religious trust or use in perpetuity having been created by the deed aside from any statutory enactment, the question is presented whether the act of 1744 in any manner defeated, impaired or rendered defeasible such trust or use. I find nothing in the act declaring, indicating or suggesting that a valid religious, charitable or pious use or trust theretofore created should be defeated, impaired or rendered defeasible thereby. The contrary is to be gathered both from the preamble and the body of the act. It appears from the former that one of the principal objects of the act was to provide a remedy for breaches of trust theretofore committed by those charged with the duty of observing and carrying into effect religious and charitable uses and trusts for the benefit of Protestant religious societies. And it was largely to provide a remedy for this condition of things that the act was passed, and not with a view to defeat or destroy valid religious, charitable or pious uses or trusts theretofore created. Section 2, which immediately follows the preamble, negatives any idea that such valid uses or trusts theretofore created should be destroyed or injuriously affected; for it provides in substance that conveyances of lands to persons in trust for "societies of Protestant churches, houses of religious worship, schools, alms-houses, and for burying-grounds, or for any of them," should be and were thereby ratified and confirmed to the persons to whom the same were granted, their heirs and assigns, in trust, and not otherwise, but for the use of the same religious societies for whom they were at first so granted, "according to the true intent and meaning of such gifts, grants, or bargains and sales." There was thus an express ratification and confirmation of prior conveyances of lands for churches, houses of religious worship, schools, alms-houses and burying-grounds, for Protestant religious societies; the same to be held in trust "according to the true intent and meaning" of such gifts and conveyances. The remaining portion of section 2 deals with the case of alienation by trustees of land constituting the subject of the trust. Sections 3 and 4 are prospective and consequently have no application to the conveyance from Stidham. The conveyance from Stidham prior to the act of 1744 having been to trustees for an unincorporated religious society, namely, the "Presbyterian Church," of land in fee for the use, among others, of "a Meeting House" and "Burying Ground," received the ratification and confirmation of section 2 to the extent at least of such trust or use, if any were required.

I have neither found nor been referred to any legislation in the three lower counties on Delaware or in the state of Delaware divesting the land conveyed by Stidham of the religious, charitable or pious trust impressed upon it with respect to its use for houses of worship and as a burying ground. The legislation relating to religious societies strongly points in the opposite direction. The act of February 3, 1787, 2 Del. Laws 878, entitled "An Act to enable all the religious denomina-

tions in this state to appoint trustees, who shall be a body corporate, for the purpose of taking care of the temporalities of their respective congregations," provided for the first time in Delaware for the corporate management of the temporal affairs of religious societies or congregations. While providing for the election of trustees who should be a body corporate for the purpose of caring for the temporalities of the religious society or congregation, with power to acquire and dispose of property for its use or benefit, and to have and use a common seal and "as often as they shall judge expedient, break, change, and new-make the same or any other their common seal," in section 5 it was declared as follows:

"Sec. 5. All lands, tenements, hereditaments, and real estate, bona fide given, granted, conveyed, or transferred, by any last will in writing, deed of gift, bargain and sale, or other lawful conveyance, to any religious society or congregation, or to any person or persons in trust for them, and to their use, before the twentieth day of October, in the year of our Lord one thousand seven hundred and forty-four, the said congregation, or any person in trust for them, or expressly for their use, having hitherto continued in the peaceable and quiet possession of the same hereditaments and real estate, and for the recovery whereof no action or actions hath, or have, been brought by any person or persons against any such religious societies, or congregations, or their trustees, shall be, and hereby are declared to be, to and for the use of the same, according to the purport and effect, true intent and meaning of such last will, deed of gift, or bargain and sale, or other lawful conveyance, and to and for no other use, intent or purpose whatsoever."

Under and pursuant to the above act the congregation of the "Presbyterian Church," a predecessor of the corporation defendant, elected December 23, 1789, trustees who became a religious corporation in the name of "The First Presbyterian Congregation of the Borough of Wilmington." Chapter XXXIX of the Delaware Revised Code of 1852, entitled "Of Religious Societies," while providing in section 3 that the trustees should have "power to purchase, receive, hold and enjoy property, real and personal, for the use of the said society or congregation, their ministers or members, or for schools, alms-houses or burying grounds," also declares in section 12 which contains a proviso not material in this connection, that "all real estate, bona fide given, or granted by will, deed, or other conveyance to any religious society, or congregation, or to any one in trust for them, or to their use, before the twentieth of October, A. D. 1744, shall be for the use of the same, according to the intent of the donor or grantor, and the form and effect of the will, deed, or conveyance." So, in Chapter 68 of the Delaware Revised Code of 1915, p. 1038, it is provided in section 4 that the trustees shall have "power to purchase, receive, hold, mortgage and enjoy property, real and personal, for the use of the said society or congregation, their ministers or members, or for schools, alms-houses or burying grounds"; and in section 12, concluding with a proviso not material to consider in this connection, there is a provision identical with that contained in section 12 of chapter XXXIX of the revised code of 1852 giving effect to the "intent of the donor or grantor, and the form and effect of the will, deed, or conveyance."

In view of the foregoing facts and legislation there can be no reasonable question that the land conveyed by Stidham was impressed

with a valid religious, charitable or pious use, and was held by the corporation defendant and its predecessors in title in trust to be used as a burying ground or cemetery, and for the erection and maintenance of churches or meeting houses, or for one or more of the other uses set forth in the above legislation touching religious societies and embraced within "other pius uses" as that phrase is employed in the Stidham deed. Indeed, this is not denied, but admitted on the part of the defendants. But while conceding that the land was and is subject to such trust or use so long as it continues to be held by the corporation defendant, and that while continuing to hold it the corporation defendant could be compelled by the beneficiaries under such trust or use or others having sufficient interest therein, faithfully to observe the same, it is strenuously urged that the power of alienation is under the laws of Delaware possessed by the corporation defendant and that a conveyance by it in fee of the land theretofore subject to such trust or use would operate to vest in the grantee a title to the land absolutely discharged from such trust or use. And special stress is laid upon the provision in section 8 of the above act of February 3, 1787, that the trustees of a religious society

"shall and may give, grant and demise, assign, sell and otherwise dispose of, all or any of their messuages, houses, lands, tenements, rents, possessions, and other hereditaments, and real estate, and all other goods, chattels, and other things aforesaid, as to them shall seem meet, for the use and benefit of the society or congregation to which they shall respectively belong."

But I am not aware of any rule of statutory construction or principle of law supporting the proposition that under and solely by virtue of such a general power of alienation the trustees of a religious society possessed authority or power to sell and convey land of the corporation free and discharged from a valid charitable, religious or pious trust or use in perpetuity impressed upon or attaching to such land at the time of such sale and conveyance. Ability to accomplish such a result solely under and by virtue of such a general power of alienation could no more exist than could power to nullify or get rid of a valid lien or encumbrance on the land to secure the payment of money not yet due. If the maintenance of a cemetery under a valid charitable or pious trust in perpetuity should prove detrimental to the public health, that use, so far as so detrimental, could be controlled or terminated by a proper exercise of the branch of sovereignty known as the police power of the state. So, should the land impressed with such trust or use be required for a public purpose inconsistent with its continuance it could be condemned and taken upon the making or securing of just compensation, through an exercise of the sovereign power of eminent domain, and thereupon the trust or use would terminate with respect to the land so condemned and taken. And equally, if at the time land is conveyed by way of a valid charitable or pious trust or use, there be a statutory provision for the termination of such trust or use or for the conveyance of the land free and discharged therefrom, upon compliance with certain requirements, not only the creator of the trust or use, but in the absence of grant, contract, estoppel or other special circumstances enuring to their protection, individuals subse-

quently becoming beneficiaries thereof or interested therein, as the case may be, must be treated as having created the trust or use or as having acquired rights therein in subordination to the right to terminate the trust or use or to convey the land discharged of the same upon such compliance, and consequently to have consented thereto. Persons in entering into a contract must be held to adopt as part thereof existing substantive law relating to its subject matter. But here there has been no attempt to invoke the right of eminent domain, or the police power for the protection of the public health, nor was there in existence prior to the conveyance from Stidham nor at any time since nor is there now any statutory provision for the termination of the trust or use in question or for the conveyance of the land free and discharged therefrom.

Counsel on this application have taken a wide range in their arguments and have raised a number of points unnecessary now to be decided. This is not a suit by the heirs of Stidham or by others claiming under him for the establishment of a resulting trust in the land included in the cemetery or any portion of it. Nor is it a suit for the recovery of land for breach of a condition subsequent. No question of resulting trust or of breach of condition subsequent is properly before this court. Aside from the attempted sale and conveyance to Bailey for the purposes of a public library, there has been no abandonment by the corporation defendant or any attempt by it to abandon the pious or charitable use or trust under the deed of Stidham with respect to the whole or any part of the land in the cemetery. It appears, it is true, that since the year 1906 there have been no interments there; but the cemetery, until the contract to convey to Bailey, always continued to be properly cared for and kept in repair, and maintained as a cemetery. It is well settled that it is not necessary to the continued existence of an established cemetery or to the protection of bodies, graves, vaults, monuments, and other structures within it, or to the right of the owners or holders of burial lots therein, that there should be no cessation of interments. The fact that human remains repose in the soil in numbers not safely or lawfully to be exceeded affords no justification or excuse for dismantling and desecrating the resting place of the dead, removing or destroying the memorials erected by affection to departed worth, or violating or disregarding the pious or charitable use and trust impressed upon the land and the right of owners or holders of burial lots or the relatives of those buried in the cemetery to have the same preserved in its integrity. This suit does not proceed upon any theory of the expiration or extinction, through abandonment or otherwise, of the pious and charitable use and trust created by Stidham, but on the contrary is brought to restrain the violation thereof by the corporation defendant acting in conjunction with Bailey.

Language has been employed in some of the decisions touching the relations between cemetery companies or religious societies owning burying grounds, and persons holding burial lots therein, which if applied to this case would be palpably inaccurate and unsound. It has been said that such lot holders possess only a mere license or priv-

ilege to use and maintain their lots during the continuance of the cemetery or burial ground as such. But such a doctrine is wholly inapplicable to the relation between the corporation defendant and the holders of lots in its cemetery. They have much more than a mere license or privilege to use the lots appropriated or assigned to them. Were it otherwise their right to continue in the possession of burial lots would be revocable and determinable at any time at the whim or pleasure of the corporation defendant. A mere license or personal privilege to enter upon and occupy land is not only revocable and terminable at any moment, but is non-assignable and non-descendible. If not earlier ended it terminates with the death of the licensee. In De Haro v. United States, 5 Wall. 599, 627 (18 L. Ed. 681), the court said:

> "There is a clear distinction between the effect of a license to enter lands, uncoupled with an interest, and a grant. A grant passes some estate of greater or less degree, must be in writing, and is irrevocable, unless it contains words of revocation; whereas a license is a personal privilege, can be conferred by parol or in writing, conveys no estate or interest, and is revocable at the pleasure of the party making it. There are also other incidents attaching to a license. It is an authority to do a lawful act, which, without it, would be unlawful, and while it remains unrevoked is a justification for the acts which it authorizes to be done. It ceases with the death of either party, and cannot be transferred or alienated by the licensee, because it is a personal matter, and is limited to the original parties to it. A sale of the lands by the owner instantly works its revocation, and in no sense is it property descendible to heirs. These are familiar and well-established principles of law, hardly requiring a citation of authorities for their vindication."

But if what would otherwise be a mere license has for its object the permanent occupation of land, and its accomplishment involves the expenditure by the person to whom granted of money upon or in connection with the land, and the circumstances attending and surrounding the grant clearly evince an understanding and intention by both parties that its operation shall be permanent and not confined to the lifetime of the person to whom granted, and money be expended accordingly, there is presented the case of a license so executed as to constitute in equity, if not at law, an irrevocable contract good as against the original parties and their heirs or successors. This principle was recognized by the late Chancellor Bates in Jackson & Sharp Co. v. P. W. & B. R. R. Co., 4 Del. Ch. 180, though the facts disclosed in that case did not permit its application. There it was held that the construction of a side-track connecting with the railroad at the expense of a manufacturing company and the subsequent expenditure of money by the latter in the erection of car-works from which cars were delivered from the side-track, did not render a license to connect it with the railroad irrevocable, for the reason that there was no express contract that there should be a permanent indefeasible right to so connect, and the nature of the business of the railroad company was such as to indicate that the connection of the side-track was "a voluntary accommodation, to abide the good will and mutual interests of the parties." The principle was forcibly enunciated by Justice, afterwards Chief Justice, Gibson in Rerick v. Kern, 14 Serg. & R. (Pa.) 267, 16 Am. Dec. 497. He said:

"A license may become an agreement on valuable consideration; as, where the enjoyment of it must necessarily be preceded by the expenditure of money; and when the grantee has made improvements or invested capital in consequence of it, he has become a purchaser for a valuable consideration. Such a grant is a direct encouragement to expend money, and it would be against all conscience to annul it, as soon as the benefit expected from the expenditure is beginning to be perceived. * * * A right under a license, when not specially restricted, is commensurate with the thing of which the license is an accessory. Permission to use water for a mill, or anything else that was viewed by the parties as a permanent erection, will be of unlimited duration, and survive the erection itself, if it should be destroyed or fall into a state of dilapidation; in which case the parties might perhaps be thought to be remitted to their former rights. But having had in view an unlimited enjoyment of the privilege, the grantee has purchased, by the expenditure of money, a right, indefinite in point of duration, which cannot be forfeited by non user, unless for a period sufficient to raise the presumption of a release. * * * But it is otherwise, where the object to be accomplished is temporary. Such usually is the object to be accomplished by a saw-mill, the permanency of which is dependent on a variety of circumstances, such as an abundance of timber, on the failure of which the business necessarily is at an end. But, till then, it constitutes a right for the violation of which redress may be had by action."

So, in Swartz v. Swartz, 4 Pa. 353, 45 Am. Dec. 697, the same judge, in referring to Rerick v. Kern, said:

"The principle of the case is, that the revocation would be a fraud; and that to prevent it, a Chancellor will turn the owner of the soil into a trustee ex maleficio. It is in substance the same which postpones the title of one who is studiously silent as to the existence of it, in the presence of a purchaser from a third person; or of one who suffers another to build ignorantly on his ground without informing him of his mistake."

The above principle depends for its application in any given case upon the intent, expressed or presumed, of the party granting the right or privilege that it shall be commensurate with the attainment of the object for which it is granted, and not constitute merely an arrangement dependent upon and measured by the continuing will of the parties. This principle, I think, is not without application to the present case and, as will presently more fully appear, requires a recognition by this court of the right of lot owners and others directly interested in burial lots, graves, vaults, monuments and other burial fixtures, in the cemetery of the corporation defendant, to be undisturbed in their possession and enjoyment of the same subject to the "rules and regulations necessary for keeping the aforesaid graveyard or burying ground in general good condition and repair," until the cemetery shall lawfully and by proper authority be discontinued and the land applied to other purposes.

The land conveyed by Stidham to the trustees of the Presbyterian Church was for several uses, namely, for the use of a meeting house and of a burying ground, and such other pious uses as the managing body of that unincorporated religious society should deem proper. There was, however, no provision in the deed determining what quantity or proportion of the land conveyed should be devoted to any one of the pious or charitable uses therein referred to or indicating its situation with respect to the rest of the tract. It was, therefore, left to the society in the exercise of its discretion to determine the parts

and proportions of the land and their locality which respectively should be devoted to the several uses for which it was intended. Accordingly, as before stated, a portion of the land was set apart and appropriated to the use of a meeting house, now known as the Historical Society Building, and subsequently another part of the land was set apart and appropriated to the use of a church building known as the First Presbyterian Church, now occupied and used by the corporation defendant. With the exception of the two portions so set apart the land included in the deed from Stidham has immemorially been held for the purposes of and in great part used as a burying ground or cemetery. The corporation defendant is not nor was either of its predecessors in title, the Presbyterian Church and The First Presbyterian Congregation of the Borough of Wilmington, engaged in the business of making or raising money for distribution among its members. In this regard the corporation defendant and its predecessors in title have occupied a different position and status from cemetery companies or associations having beneficial features of a pecuniary character, as to which doubt has been expressed whether the purpose for which they exist is included among charitable uses. Stidham having by his conveyance created a charitable use or trust with respect to the portion or portions of the land intended, under the selection and ascertainment by the grantees and their successors in title, to be used and maintained as a burying ground and cemetery, that use or trust has ever since continued impressed and fastened upon such portion or portions. But though the use and trust with respect to the land so appropriated and devoted to the use of a cemetery is clear and definite, the trust is necessarily indefinite and uncertain with respect to the individuals who may acquire a right of sepulture or to burial lots, graves and vaults and to maintain, ornament and keep the same in good condition. In this respect the lack of certainty as to the individuals who may secure rights or benefits under the trust presents that uncertainty which is incidental to and characteristic of charitable uses in their strict legal sense. Jurisdiction in England over charitable uses belongs to the King as parens patriæ, but in Delaware to the State. The judicial branch of such jurisdiction is exercised by the court of chancery as being best adapted in that behalf by its constitution and powers. The exercise of the ministerial branch may be the subject of legislative regulation. After the conveyance by Stidham and prior to the act of 1744 the trustees, overseers and elders of the "Presbyterian Church" had power and discretion to select and ascertain the individuals who should be permitted, upon proper compliance with rules and regulations, to acquire burial rights, and after the act of 1744 the corporation defendant and its predecessors in title under and by virtue of the legislation hereinbefore recited possessed the same power and discretion.

Land set apart for the decent interment of the remains of friends and relatives, the erection of tablets, and monuments to commemorate their lives and virtues, and the beautifying of the grounds consecrated to them by the tears of their survivors is in the truest sense dedicated to a pious and charitable use. Though there be no strict property in a human corpse or the ashes representing it, when those having the

control and management of a cemetery execute the pious and charitable use by allowing, whether under a deed or other formal contract or only a permit, written or oral, the acquisition of a burial lot or space, and the interment of such remains therein and the incurring of expense in or about the interment, or the construction of vaults or erection of memorials or the suitable ornamentation of the grounds, the friends or relatives of the departed, being or representing those who obtained such deed, contract or permit, are vested with a right, of which they cannot arbitrarily be deprived, to possess, care for and maintain the burial lot or space until that right is lawfully and by proper authority terminated. When one applies for a burial lot or space and the right of interment it is to be assumed, in the absence of a stipulation or clear understanding to the contrary, that both parties contemplate and intend that he should possess a permanent right of occupation of the spot allotted for the last resting place of the dead. Even in the absence of a deed or other written muniment of title such right should be enforced in equity as a right growing out of an executed license as above mentioned.

[4] There is in evidence a deed bearing date February 1, 1843, purporting to be from the "Trustees of the First Presbyterian Church of the Borough of Wilmington" to Nelson Cleland, his heirs and assigns, for the lot on which stands the Cleland monument, "for the use and purpose of a private cemetery or burying ground for the dead, and to and for no other use or purpose whatever: the same to be subject to and chargeable with a due proportion of all future expenses and the rules and regulations necessary for keeping the aforesaid graveyard or burying ground in general good condition and repair." The attestation clause, seal and signatures are as follows:

"Witness the corporate seal of the said 'Trustees of the First Presbyterian Church of the Borough of Wilmington' hereunto affixed this first day of February, Anno Domini one thousand eight hundred and forty-three.

"Sealed and delivered in                                    James Gardner
the presence of                                              President of the
    James Riddle                                   Board of Trustees."
    John Brown

Cleland died in 1854 leaving a will, duly proved, allowed and recorded, which contains the following provision:

"I hereby appropriate the sum of $3,000 for the construction of a vault and the erection of a monument on the lot owned by me in the burying ground attached to the 'First Presbyterian Church' on Market Street between 9th and 10th Streets in the City of Wilmington, and I direct my remains shall be

deposited in the said vault. I appropriate said sum for the purpose of manifesting my regard for the Presbyterian religion and with the wish of adorning and beautifying the ground in which are interred the remains of many near and dear relations, and where I trust my descendants may repose peacefully by my side."

It is clear from the affidavits and exhibits that the name "First Presbyterian Church of the Borough of Wilmington" was through inadvertence or otherwise inserted in the deed in lieu of "First Presbyterian Congregation of the Borough of Wilmington," the correct name of the predecessor in title at that time of the corporation defendant. There is in evidence a certified copy of an assignment, bearing date February 10, 1840, by "The First Presbyterian Congregation of the Borough of Wilmington" of a mortgage, the same being executed by "James Gardner, President of Board Trustees," and by him acknowledged to be the act and deed of the corporation. The deed to Cleland was executed in the name of "First Presbyterian Church of the Borough of Wilmington," but by "James Gardner, President of the Board of Trustees." The defendants have offered no evidence tending to show that there were two distinct corporations in Delaware at the time the deed was executed, one being the "First Presbyterian Church of the Borough of Wilmington" and the other the "First Presbyterian Congregation of the Borough of Wilmington," each having or claiming title to land including the fifteen feet square lot conveyed to Cleland; and in the absence of such evidence the two designations must be held to apply to one and the same religious corporation, namely, the immediate predecessor in title of the corporation defendant. The variation between "Congregation" and "Church" in the name is not such as in any manner to invalidate or injuriously affect the deed; for it is well settled that so long as the corporate entity is the same, its acts and deeds are not vitiated by such a departure from the corporate name. Absolute accuracy in the corporate name or title is not essential to a valid exercise of corporate power; and whether the corporate entity is the same is to be determined by the facts and circumstances. Kent states the rule thus:

"The general rule to be collected from the cases is, that a variation from the precise name of the corporation, when the true name is necessarily to be collected from the instrument, or is shown by proper averments, will not invalidate a grant by or to a corporation, or a contract with it." 2 Kent, Com. *292.

It is, however, on several grounds contended that the deed to Cleland was not the deed of a predecessor in title of the corporation defendant. One ground is that it appears from an affidavit on behalf of the defendants made by Joseph S. Hamilton, one of the trustees of the corporation defendant, that he examined its records as well as those of its immediate predecessor in title both before and since the year 1843, and was unable to find any grant of authority to James Gardner, president of the board of trustees, to execute or deliver the deed to Cleland. Even if the above averment were equivalent to a statement that from such examination it did not appear that the board of trustees authorized the execution of such a deed by the proper officer or

officers, the statement is without probative force in view of the uncontradicted allegation in the affidavit of Nathaniel B. Culbert, who was secretary of the immediate predecessor in title of the corporation defendant for about twenty-five years from and after the year 1863 or 1865, as to the custom and practice of burning, with the consent and knowledge of the trustees of the church, the books and records of the corporation when the same became filled up.

It is also urged that the seal on the deed does not appear to be the corporate seal of the grantor; and attention is drawn to a minute adopted at a meeting of the trustees of the First Presbyterian Congregation of the Borough of Wilmington, held November 12, 1792, as follows:

"Doctr. M'Kinly our Chairman being appointed at a former meeting to provide a Seal for the Corporation, did now produce one about two Inches diameter with the device of an open Book in the center with the inscription SCRIPTURA SACRA & around the whole CONGREG. PRIMÆ PRESBYTEⁿ. MUN. W. SIGILm., being contractions of the following, viz: Congregationis primae presbyterianae Municipii Wilmingtoni Sigillum—which being approved it was thereupon resolved that the same should be the seal of the corporation and remain in the keeping of the chairman."

It is argued that as the deed does not bear the corporate seal described in the above minute, it cannot be assumed that it was executed under the seal of the grantor, or operated to vest any title, interest or estate in Cleland. But the attempt to discredit the deed has beyond all reasonable question failed. The verified bill which has been used as an affidavit on this occasion states in substance that interments were lawfully made in the Cleland burial lot by virtue of a deed to him from the "defendant corporation or its predecessor in title" dated February 1, 1843. Notwithstanding this averment, there is no denial in any affidavit or exhibit that James Gardner was the president of the trustees of the First Presbyterian Church of the Borough of Wilmington, or First Presbyterian Congregation of the Borough of Wilmington, or that he was authorized to execute and deliver as the act and deed of the alleged grantor the conveyance bearing that date. As has been stated, by the act of February 3, 1787, under which the trustees of the First Presbyterian Congregation of the Borough of Wilmington became a body corporate, it was provided that religious societies incorporated thereunder should have and use a common seal and "as often as they shall judge expedient, break, change and newmake the same or any other their common seal." While it appears that a corporate seal as above described was adopted November 12, 1792, by the predecessor in title of the corporation defendant, there is neither evidence nor allegation that such seal was in existence February 1, 1843, or indeed had ever been used, or that it had not at any time since its adoption and before the date of the deed been changed. The original deed was produced by consent of counsel for inspection by the court. It bears a seal referred to in the attestation clause as the corporate seal of the grantor. It is circular in form and contains the words circumferentially arranged "First Presbyterian Church Wilmington Del." There is no allegation or evidence that it was not the corporate seal of the grantor February 1, 1843. Nor is there any alle-

gation or evidence that any examination of the minutes or records of the corporation was made by its secretary or any other person to ascertain whether another corporate seal had not been adopted.

[5] The defendants, on the assumption that the deed to Cleland was valid as against the grantor and its successor, the corporation defendant, contend that it is ineffectual as against Bailey on the ground that it was not recorded and he is a bona fide purchaser for value. But I do not think he is such a purchaser. He entered into the contract to purchase and paid at the time of the execution $500, or only one four hundred and fiftieth part of the amount of the purchase price, presumably to bind the bargain, and to operate as part payment of the price of $225,000, should a good and sufficient deed "in fee simple, clear of all liens and incumbrances" be tendered to or received by him. But he has neither paid anything further, nor has he received the deed. Under these circumstances he does not come within the rule protecting bona fide purchasers for value, for it is well settled that, in the absence of some doctrine touching equitable titles not obtaining in Delaware, to constitute him such a purchaser it is necessary that he should have acquired legal title and have paid the whole or a substantial portion of the purchase price. But he has done neither. The defendants have not referred to any case in support of their contention. Further, in his answer in First Presbyterian Church of Wilmington, Delaware, Incorporated, v. Bailey, supra, as already said, he stated that "the said lot, piece and parcel of land, together with the easement appurtenant thereto, was and still remains impressed with and subject to the religious uses and trusts" set forth in the deed from Stidham. Being thus informed, when not too late to protect himself, that the land which included the Cleland burial lot was still subject to the religious uses and trusts referred to, the conspicuous and costly monument on that lot was sufficient to cause any reasonably prudent man, contemplating a purchase and using ordinary circumspection, to make inquiries of the heirs or other representatives of Nelson Cleland as to the existence of a deed serving as an inducement to the erection of such a monument. But it does not appear either that he made inquiry of such heirs or representatives, or attempted to learn from the corporation defendant or any individual where such heirs or representatives could be found. Thus, even were it assumed that the contract to purchase and his payment of the $500 constituted him a purchaser for value, he was not a bona fide or innocent purchaser within the meaning of the rule of protection.

[6] The deed to Cleland was executed more than seventy-three years ago and is therefore an ancient document. And the evidence shows that it has always been in proper custody. On the death of Nelson Cleland it passed into the possession of his widow, Christiana Cleland, and was held by her until her death, when it was received by her daughter, Mary E. Jordan, who held it until her death, when it passed into the possession of her son, Sidney S. Jordan, with whom it remained until May 13, 1916, when it was delivered to Archie N. Jordan, who on the same day turned it over to the solicitors for the complainant in the bill as originally filed. Nelson Cleland, as has appeared, in

and by his will asserted his ownership of the burial lot in question; and his heirs-at-law have under the deed and the right and title conferred by it from the date of his burial in 1854 until the present day exercised acts of ownership over the burial lot therein described and have erected and constructed at large expense, and have maintained in proper condition, the monument, vault and copings above mentioned. As an ancient deed coming from the proper custody the deed proves itself. 1 Greenl. Ev. § 570. In Lay v. Carter, 151 N. Y. Supp. 1081, it was held that where a family used part of a lot of land for burial purposes for more than seventy-five years with no record title, the record owners, who knew of such user and by silence consented to it, would be deemed to have dedicated for a cemetery so much of the lot as was actually so used.

The deed to Cleland having been to him, his heirs and assigns forever, "for the use and purpose of a private cemetery or burying ground for the dead and to and for no other use or purpose whatever," subject to a share of the expense and to the rules and regulations for maintaining the cemetery in good condition, he had a base fee thereunder, subject to restriction relative to expense and rules and regulations. Pitcairn v. Homewood Cemetery Co., 229 Pa. 18, 77 Atl. 1105. In that case, decided in 1910, a cemetery company was restrained from preventing the erection of a mausoleum by a lot owner on a portion of the lot on which it was intended to be placed. The court said:

"What is the interest of the plaintiff in this lot? * * * The conveyance is, in terms, of the lot itself, not of a mere interest therein. The deed is for the consideration of $9,000, and purports to 'grant, bargain, sell and convey,' said lot to 'Robert Pitcairn, his heirs and assigns,' to have and to hold the same to him, 'his heirs and assigns forever,' subject to the conditions, etc., 'specified in the rules and regulations hereto annexed,' together with a warranty. * * * By the terms of the deed itself, the lot is to be held subject to the rules and regulations annexed. Thereby, the use of the lot is limited to the use of the burial of the dead. The purchaser cannot erect improper improvements, he cannot transfer or assign the lot without the consent of the defendant, and he holds the lot subject to the rules which may from time to time be adopted by the board of managers. * * * But there is no restriction upon the power of the owner to devise the lot by will, nor is there any restriction which will prevent its descent according to the law of inheritance. Hence we conclude that the estate which vested in Robert Pitcairn, by virtue of said deed, is more than was acquired by the conveyances, considered in Kincaid's Appeal, 66 Pa. 411 [5 Am. Rep. 377] in Hancock v. McAvoy, 151 Pa. 460 [25 Atl. 47, 18 L. R. A. 781, 31 Am. St. Rep. 774] and that line of cases. * * * We are thus unable to agree with the defendant that Robert Pitcairn acquired but a license or easement in the lot aforesaid."

Cleland's estate under the deed in question being transmissible and descendible, the complainants have inherited from two of his three children to whom the burial lot was devised equally in fee two-thirds of the right, title and interest conveyed to him.

I think there is something wrong in point of law as well as in point of morals involved in the proposition that Cleland, after the execution and delivery of the deed to him, and the receipt by the owner of the cemetery from him of valuable consideration therefor, and the expenditure by his descendants of labor and money in the construc-

tion and erection of a vault, monument and other improvements, is to be treated as having obtained a mere license or privilege, determinable at any moment the owner of the cemetery may find it advantageous or profitable to dispose of it or a part of it for some foreign purpose. If it be assumed in accordance with the contention of counsel that the corporation defendant has the right, were it not for the deed to Cleland, to convey in fee a portion of the cemetery to Bailey for the purposes of a public library, I fail to perceive why the predecessor in title of the corporation defendant had not a right to convey in fee a portion of the cemetery to Cleland for proper burial purposes. The suggestion that under the deed to Cleland there was only a right to hold and maintain the burial lot so long as the cemetery should remain as such does not affect the question whether the owner of the cemetery did not preclude itself from discontinuing the cemetery as such, in the absence of proper legislative authority to that end. The argument on the score of hardship advanced on the part of the defendants has, I think, but little force, especially under the circumstances of this case. No complaint has been made of the cemetery. It has been maintained in excellent order and condition; and no reason appears, unless the desire to receive the purchase money contracted to be paid by Bailey, why the cemetery, or a large portion of it, should now be dismantled, aliened and applied to other uses.

In Brick Presbyterian Church, 3 Edw. Ch. (N. Y.) 155, it was held that where a religious corporation had acquired land in fee for the purposes of a church and a grave yard, it could grant in fee a portion of the land for a burial vault, and that the same could not be sold against the objection of the grantee. The point was raised and sustained that "no sale or alienation of the property, by which it is to be converted to secular purposes, can be made, without infringing vested legal rights." The court distinguished between pew-holders and vault owners; recognizing that the right of the former would fall with the destruction or removal of the church building, but that a conveyance in fee of the land for a vault gave a permanent and substantive right to the soil. It said:

"Since, then, there may be a right of property acquired in monuments or tombs erected by a faculty or grant, why may not such a right be acquired by purchase from the corporation of a religious society? A vault, in reference to interment, is but a place to entomb; and when so used, becomes a tomb; a receptacle for the dead—a last resting place. A grant of such a place gives an exclusive right; and why may it not be perpetual? * * * It is certainly competent for a man, at this day, to buy the fee simple of an estate in land for the purposes of sepulture; and when converted to that use, the title may descend or be again the subject of sale. The conveyance * * * to the church * * * was a conveyance of the fee of the land, a base or determinable fee, being subject to a quit rent and to a condition that the land should be appropriated to a particular purpose—that of a church and cemetery. This renders it a conveyance to a pious and charitable use; but it was still a conveyance of the land and conferred on the grantees an estate and interest in land for the purposes intended. In appropriating this land to such intended purposes, it was competent for the trustees to dispose of it as they might think proper not inconsistent with the grant and the use for which they expressly held it, namely, on a part of the ground to erect a church edifice; in another part to construct vaults for public use, reserving a space for graves to be opened, on such terms as they might think proper to pre-

scribe; and the residue to lay out for private vaults and to sell the sites or ground for that purpose. And such sales might be of the fee of the land;—true, only a base fee, such as had been conveyed to them. * * * The intention obviously was, to sell and dispose of *the land;* and not to grant a mere temporary use or privilege to construct vaults in the land with a reserve of the title to the church. * * * I cannot but conclude that the deed and the lease in question confer title to the land, and not a mere easement or privilege to inter the dead. If I am correct in this, it can make no difference that any further interments are now prohibited within these vaults, and certainly no argument drawn from this circumstance can give the petitioners any right to resume the control of the vaults, to break them up or desecrate the·ground."

The case before this court is stronger for the complainants than that of Brick Presbyterian Church in that, while here there has been no legislative action for the discontinuance of the cemetery, there an application for the sale of the entire property was made under the New York statute of March, 1806, (Laws 1806, c. 43) authorizing the Chancellor upon application of any religious corporation to order the sale of its real estate and direct the application of the proceeds to "such uses as the same corporation, with the consent and approbation of the chancellor, shall conceive to be most for the interest of the society to which the real estate so sold did belong." While the existence of that statute has led to some contrariety of view as to the force of the decision in Brick Presbyterian Church, its reasoning applies in full force to the case in hand. Windt v. German Reformed Church, 4 Sandf. Ch. (N. Y.) 471, was decided with reference to the act of April 11, 1842 (Laws 1842, c. 215), which provided as follows:

"Sec. 2. It shall not be lawful for any person or persons to remove any dead body or human remains from any burying ground, for the interment of which compensation shall have been received by any church or religious corporation, or by any officer or officers thereof, and which shall have been used for that purpose during the last three years, with the intent to convert the said burying ground to any other purpose, without having first obtained the consent in writing of three-fourths in number of the congregation or society of such church or corporation; and which consent shall be proved or acknowledged and recorded in the manner prescribed by the first section of this act, before any such removal shall be commenced or attempted."

Notwithstanding the above act, the provisions of which had been fully complied with, the complainants sought to restrain the church from removing the remains of relatives from the burial lots in which they had been interred. No one of the complainants had any deed of a vault or a portion of the ground, or any title thereto. The court distinguished between the rights of those who held title to vaults or burial lots and those who did not, and while holding that a sale effected pursuant to the statute was· good as against the latter, said:

"Where vaults or burying lots, have been conveyed by religious corporations, rights of property are conferred upon the purchasers. This was the case with the corporation of the Brick Presbyterian Church, 3 Edw. Ch. 155. The right is like that to any other real estate, and is as perfect without sepulture, as it is where the grantee has used it for that purpose."

[7] The right of property of those acquiring burial lots under conveyances in fee is recognized in many other cases, among which are New York Bay Cemetery Co. v. Buckmaster, 49 N. J. Eq. 439, 24 Atl. 2, where the conveyance of the burial lot was "subject, however, to the conditions and limitations and with the privileges specified in the rules and regulations now made, or that may hereafter be made, and adopted by the managers of the said cemetery for the government of the lot-owners and visitors to the same." Rosehill Cemetery Co. v. Hopkinson, 114 Ill. 209, 29 N. E. 685; Clark v. Rahway Cemetery Co., 69 N. J. Eq. 636, 61 Atl. 261, where the conveyance to the lot owner was "subject to such rules and regulations as the trustees thereof have or may adopt respecting the said cemetery and its management."

A court of equity at the instance of proper parties has power to restrain the threatened wrongful destruction or removal of tombs, vaults, coffins, human remains, or monuments in or from a cemetery, or wrongful injury thereto, or to the burial premises. Beatty v. Kurtz, 2 Pet. 566, 7 L. Ed. 521; Boyce v. Kalbaugh, 47 Md. 334, 28 Am. Rep. 464; Davidson v. Reed, 111 Ill. 167, 53 Am. Rep. 613; Wormley v. Wormley, 207 Ill. 411, 69 N. E. 865, 3 L. R. A. (N. S.) 481; Roundtree v. Hutchinson, 57 Wash. 414, 107 Pac. 345, 27 L. R. A. (N. S.) 875; Kelly v. Tiner, 91 S. C. 41, 74 S. E. 30; Mitchell v. Thorne, 134 N. Y. 536, 32 N. E. 10, 30 Am. St. Rep. 699; Ritter v. Couch, 71 W. Va. 221, 76 S. E. 428, 42 L. R. A. (N. S.) 1216.

[8] The several owners and holders of lots in a cemetery have a common interest in its decent and proper maintenance as a whole. Clark v. Rahway Cemetery Co., 69 N. J. Eq. 636, 640, 61 Atl. 261; Tracy v. Bittle, 213 Mo. 302, 112 S. W. 45, 15 Ann. Cas. 167; Rosehill Cemetery Co. v. Hopkinson, 114 Ill. 209, 29 N. E. 685. For, while each owner or holder is directly and immediately interested in the lot controlled by him, he is at the same time interested that its surroundings shall be those appropriate to a well ordered resting place for the ashes of the dead, and not converted into a waste place or a dumping ground for refuse matter or the accumulation of débris, or into a site for the erection of buildings foreign to the pious or charitable use to which the land has been dedicated and devoted. There is an implied contract to this effect between those owning or controlling the cemetery and those acquiring the ownership or possession of burial lots therein. And so long as the cemetery continues as such it is immaterial that interments may have ceased by reason of overcrowding or considerations touching the public health or other cause. In Stockton v. Newark, 42 N. J. Eq. 531, 541, 9 Atl. 203, 208, the court said:

"The object of burial is not to put the dead away temporarily, merely, but to place them in a final resting-place. When land is given in trust for a burial-place, it obviously can by no means be said that the trust is at an end when the last body which can be buried in it has been deposited. The expectation in the burial of the dead is that they are to remain permanently, and the unauthorized disturbance of their remains is regarded with abhorrence as a desecration, and is criminal. A trust for a burial-place devotes the ground to the perpetual repose of the remains of the dead."

There is abundant authority to the effect, not only that a wrongful threatened destruction or dismantling of a cemetery may be the subject of injunctive relief at the hands of any one or more of those directly and immediately interested therein, but also that persons having relatives and friends buried in a cemetery may maintain a suit to enjoin the defacing or desecration of the graves, monuments, etc., and to preserve the premises as a cemetery. Wormley v. Wormley, 207 Ill. 411, 69 N. E. 865, 3 L. R. A. (N. S.) 481; Beatty v. Kurtz, 2 Pet. 566, 585, 7 L. Ed. 521; Boyce v. Kalbaugh, 47 Md. 334, 28 Am. Rep. 464; Tracy v. Bittle, 213 Mo. 302, 112 S. W. 45, 15 Ann. Cas. 167; Roundtree v. Hutchinson, 57 Wash. 414, 107 Pac. 345, 27 L. R. A. (N. S.) 875; Kelly v. Tiner, 91 S. C. 41, 74 S. E. 30; Ritter v. Couch, 71 W. Va. 221, 76 S. E. 428, 42 L. R. A. (N. S.) 1216; Davidson v. Reed, 111 Ill. 167, 53 Am. Rep. 613; Mitchell v. Thorne, 134 N. Y. 536, 32 N. E. 10, 30 Am. St. Rep. 699; Lay v. Carter, 151 N. Y. Supp. 1081.

The right of the complainants to sue on behalf of themselves and others is supported by equity rule 38 (198 Fed. xxix, 115 C. C. A. xxix) which provides:

"When the question is one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court, one or more may sue or defend for the whole."

This rule accords with the principle, laid down by Pomeroy, permitting such a suit—

"where a number of persons have separate and individual claims and rights of action against the same party, but all arise from some common cause, are governed by the same legal rule, and involve similar facts, and the whole matter might be settled in a single suit brought by all these persons uniting as co-plaintiffs, or one of the persons suing on behalf of the others, or even by one person suing for himself alone."

That the jurisdictional amount is involved in this controversy, whether treated as relating to the cemetery as a whole or only to the Cleland burial lot with its vault, monument, etc., is clear and unquestioned.

The defendants in support of their contentions have cited a number of cases, to some of which reference will now be made, decided under or in view of statutory enactments. Unless read in connection with the statutes these cases are misleading and embarrassing; but when so read it will be found they lend little, if any, support to the propositions for which they are cited. In Richards v. Northwest Protestant Dutch Church, 32 Barb. (N. Y.) 42, an injunction against the removal of the remains of the plaintiff's relatives from a certain vault in a church yard and the destruction of the vault was refused. The decision was under the New York statute of March, 1806, above referred to in connection with the case of Brick Presbyterian Church. The religious corporation had conveyed a piece of ground in the church-yard to the grantee, "his heirs and assigns, forever," to be used "for the purpose of a burial place, and for no other purpose whatever," and on the lot so conveyed the vault in question was constructed. The lot was conveyed and the vault constructed in the face of the above statutory

provision.   Proceedings for the sale of the church premises, including the lot and vault, were duly had pursuant to the statute.   The court said:

"Every person purchasing either a pew in a church edifice, or a grave in a church-yard, appendant to a church, does so with the full knowledge and implied understanding that change of circumstances may, in time, require a change of location; and that the law, (a positive statute which has been in existence nearly half a century,) looking to such exigency, authorizes the corporation, when it arrives, as the representative of all interests, with the sanction of the court, to sell the soil in absolute fee, discharged of all easements, and to make some other more appropriate investment or disposition of the proceeds."

Went v. Methodist Protestant Church, 80 Hun, 266, 30 N. Y. Supp. 157, was decided under the New York statute of April 12, 1893, which provided:

"The Methodist Protestant Church of the Village of Williamsburgh is hereby authorized to remove or cause to be removed from said land the remains of all bodies buried and now remaining therein and all monuments, headstones and lot or plot fences thereon, to some cemetery or other suitable place or places; and to procure by purchase or otherwise, other land to be used for cemetery purposes; and to sell, at public or private sale, the said land now belonging to said Methodist Protestant Church of the Village of Williamsburgh, and by good and sufficient deed or deeds to convey the same to the purchaser or purchasers thereof, and to apply so much of the proceeds of such sales as may be required for such purpose toward payment of the expenses of said removal and the procuring of a suitable place or places to which such removal may be made as herein provided for."

A judgment restraining the defendants from selling the cemetery or in any manner interfering with or using it except for cemetery purposes was reversed, the court saying:

"The power of the Legislature to prohibit interments in or to remove the dead from cemeteries which in the advance of urban population may be detrimental to the public health or in danger of becoming so, is not at this day a debatable question.  *  *  *  My conclusion is that the act of 1893 was a valid exercise of legislative power, and the action of defendants thereunder cannot be restrained."

Craig v. First Presbyterian Church, 88 Pa. 42, 32 Am. Rep. 417, was decided under the Pennsylvania act of April 18, 1877 (P. L. 54).   On a petition by the trustees of the church for the removal of the remains of the dead from a portion of its burial grounds, a decree was granted accordingly, the court holding that the statute authorized such action, and stating:

"The right of the legislature to authorize the removal of the remains of the dead from cemeteries is well settled.  So it may delegate such power to municipalities.  It is a police power necessary to the public health and comfort."

The constitutionality of the statute was assailed.   But it is wholly immaterial so far as present purposes are concerned whether it was valid or invalid; for the fact remains that the decree was expressly based upon the statute.   In the course of the opinion the following significant language was used:

"The record does not show, nor does Mr. Craig allege that he has buried any dead in the grounds, or that he has any right to do so. Mr. Guthrie alleges that he has relatives buried there, but in no part of the record does he

show that he has any rights of sepulture in said grounds or any contract relation with the church. * * * We have no accurate information as to the precise nature of the relations between the church and those privileged to bury in its grounds. It does not appear that any one of them had any right to or title in the soil, nor any right of sepulture in any particular lot or place in the yard."

In this case Chief Justice Agnew delivered a forcible dissenting opinion. His views, however, did not prevail as against the provisions of the act. But some of his language is peculiarly appropriate to the case in hand, where there is or has been no such statute. He said:

"To coin money out of the bones of the dead, is to violate a purchaser's right of sepulture, contrary to the instincts of the race and the keenest sensibilities of the heart. Among all tribes and nations, savage and civilized, the resting places of the dead are regarded as sacred. There memory loves to linger and plant the choicest flowers; there the sorrowing heart renews the past, rekindles into life the viewless forms of the dead, revives the scenes where once they moved, and recalls the happy hours of love and friendship. There parent and child, husband and wife, relatives and friends, with broken spirits and crushed hopes, revisit often the spot where they deposited their dead. Who does not feel the fountains of his heart broken up and the warm gushings of emotion, when standing over the green sod which covers the departed. Wherever the simple stone is placed, or the marble monument is reared, spontaneous thought inscribes upon it 'sacred to the memory.'' * * * Can a private association, corporate or unincorporate, sell a right of sepulture to-day, and to-morrow or next year retake the ground for a lecture or a school room? It is immaterial whether a grant of sepulture confers an estate or privilege; it is a purchased right founded in contract, which no law can violate, except for a public necessity. * * * It has no analogy to the privilege of a pew and cannot fall with the building. Its occupancy is permanent, not like that of a pew, periodical and temporary. If the building fall, is burned, destroyed or rebuilt, the pew right falls with it. But the purchased grave has no such necessary and intrinsic weakness of title. There the body is laid away, according to the rites of Christian burial, and in the acts of Christian faith, to await the resurrection morn, when its dust, reanimated by the Creator's call, shall rise to meet the Lord. Then why should a Christian congregation violate instinct and law, on the ground of privilege? * * * This is a contract privilege not dependent on a building. If I buy the privilege of running water, or a right of way, or a right to open my windows over my neighbor's yard, what law justifies its violation?"

Partridge v. First Independent Church of Baltimore, 39 Md. 631, was decided under the Maryland statute of March 28, 1868 (Laws 1868, c. 211), which provided for the sale under a decree of court of "any ground dedicated and used for the purposes of burial in which lots have been sold and deeds executed or certificates issued to the purchasers of such lots, provided such lots shall be no longer used for burial purposes"; and further provided as follows:

"That a decree passed in a proceeding for the sale of a burial ground shall be valid to pass the title to the purchaser or purchasers of the same or any part thereof free, clear and discharged of and from the claims of the corporation or trustees who may hold the same for the purposes aforesaid, their successors or assigns and of all persons [having] an interest as lot holders in such ground whether they are entitled as original lot holders and whether they be residents or nonresidents, adults or infants."

It was conceded that the "proceedings for the sale * * * were in all respects regular, and in conformity to the requirements of that act." The claimants of the burial lots did not hold deeds therefor but

only certificates "signed by the chairman of the trustees, and attested by the register"; and the court said:

"What right or interest did this certificate confer upon its holder? We think it clear that it conferred no title or estate in the soil; nor could it operate as a grant of an easement, because it was not under seal, nor was it acknowledged and recorded, so as to be effective to convey such an interest. * * * Whenever, therefore, by lawful authority, the ground ceased to be a place of burial, the lotholder's right and privilege ceased, except for the purpose of removing the remains previously buried."

Schier v. Trinity Church, 109 Mass. 1, was decided under chapter 221 of the Massachusetts statutes of 1871, which provided in the first section that the church might sell and convey at private or public sale the land upon which the church building then stood, together with the buildings thereon standing, and might give to the purchaser or purchasers "good title, free of any trusts," and in the second section for the appraisal of pews in the church and of the rights in tombs under the same, and in the third section for the application of the balance of proceeds of sale over and above the payment of debts of the proprietors of the said pews and rights in tombs, toward the purchase of land for the erection of a new church, to be held "upon the same trusts, if any, as the estate and church in Summer Street are now held." It was held that where real estate "is held in trust for the general purposes of the religious society, and cannot otherwise be conveyed, the Legislature has constitutional power to authorize the trustees to convert their real estate into personal, in order that the avails may be reinvested or otherwise appropriated to the purposes of trust." The court added:

"The defendants contend that the rights in tombs are mere licenses, and revocable at any time. * * * But it is not necessary to decide that question, as the legislative act justifies this removal of the tombs."

In Brendle v. German Reformed Congregation, 33 Pa. 415, on which some stress has been laid, certain members of the congregation sought to restrain it and its trustees from mortgaging real estate which had been conveyed by Casper Wistar to certain persons in fee simple, who shortly thereafter executed a declaration of trust to the effect that the land was granted to them by direction of members of the Dutch Reformed Church or Congregation, at Tulpehocken, and that they held the same in trust, "for the benefit, use, and behoof of the poor of said Dutch Reformed Congregation, at Tulpehocken, aforesaid, forever; and for a place to erect a house of religious worship, for the use and service of the said congregation; and if occasion shall require, for a place to bury their dead." The court below found that "the congregation furnished the purchase-money, and the grantees originally took the conveyance for its use." A church was built upon the land and a portion dedicated for a grave yard. Long afterwards it was resolved by the congregation at a regular church meeting to pull down the old church and build a new one on its site, and also another new church in a different locality; and it was determined to borrow money for the accomplishment of the end in view. The court below said:

"There is nothing in the original conveyance of the hundred acres of land, even tending to show that Casper Wistar conveyed it to the persons therein named as a charity, or for any such use or purpose. On the contrary, it purports to be an absolute sale, for a full and adequate consideration, without any trust whatever. When the congregation became the owners of the property, through the purchase of their trustees, they had a right to give it such direction as they thought proper—authorize it to be sold again, held for the erection of a church, a school, a burial place, or any other useful purpose. * * * We do not consider that any founders of this charity intended that their bones or those of their descendants should ever be sold or mortgaged to strangers, under any pretext of expediency or necessity. * * * We fully agree with all the sentiments so beautifully expressed by Mr. Justice Woodward, in Brown v. Lutheran Church, 11 Harris [23 Pa.] 495, and believe with him, 'that the resting-place of the dead should be hallowed ground.' * * * We believe it our duty to restrain, by injunction, this congregation from selling, or encumbering by mortgage or judgment, so much of the hundred acres of land described in the bill as has been set apart for a grave yard."

A decree was accordingly made restraining the defendants from selling, mortgaging or encumbering the burial ground, or the old church, but permitting them to sell, mortgage or encumber the rest of the property. No appeal was taken from the injunctive feature of the decree, but only from that part which granted the above permission. The decree was affirmed. The above case is radically different from that in hand, in that here there was no plain conveyance by Stidham in fee simple, without the expression of any charitable or pious use or trust, and, further, in that such use or trust had been created and constituted before the act of 1744 was passed. In Rayner v. Nugent, 60 Md. 515, the court dealt with a mere certificate for a burial lot, signed by the secretary of the board of trustees of a religious corporation, but without the corporate seal or other formality of execution. It was held that when the corporation decided that the cemetery was no longer desirable as a place of interment, "that decision operated to revoke the certificate or license, and the right of further interment was extinguished," and, the bodies of those buried in the cemetery having been removed, the lot holders had no interest in the premises. It was further held that the fact that a corporation made a private sale of the property, and not one under a bill filed pursuant to the act of 1868, did not distinguish the case in principle from Partridge v. First Independent Church of Baltimore, 39 Md. 631. In my opinion, the decision in Rayner v. Nugent is very questionable; but, however that may be, the facts here disclosed clearly distinguish the present from the Maryland case. Kincaid's Appeal, 66 Pa. 411, 5 Am. Rep. 377, was decided under the Pennsylvania statute of April 13, 1867 (P. L. 1234), authorizing the vacation and sale of a cemetery by commissioners and the removal of the bodies to other land to be purchased with the proceeds, and, after defraying expenses, the payment of the balance to the lot holders according to their rights to be ascertained by arbitrators appointed by a court. A preliminary injunction had been granted restraining the defendants, who claimed to act under the statute, from "digging up and removing the dead," etc. The decision was based upon the statute, the court saying:

"We have come, then, to the conclusion that the act of assembly of April 13th, 1867, was constitutional and valid, and that the preliminary injunction below ought not to have been awarded."

And Sharswood, J., in delivering the opinion of the court, drew attention to the fact that the certificate for burial lots, though under the corporate seal, did not contain "words of inheritance." Pitcairn v. Homewood Cemetery, 229 Pa. 18, 77 Atl. 1105, serves to distinguish Hancock v. McAvoy, 151 Pa. 460, 25 Atl. 47, 18 L. R. A. 781, 31 Am. St. Rep. 774, from the case in hand. In Riggs v. New Castle, 229 Pa. 490, 78 Atl. 1037, 140 Am. St. Rep. 733, the ancestors of the plaintiffs entered, as parties of the first part, into a written agreement under seal with the borough of New Castle that the borough and its assigns might and should occupy forever for "purposes of wharf" a strip of land on the west side of Neshannock creek, in consideration that the parties of the first part, and their heirs and assigns, forever, should and might occupy a certain piece of land then owned by the borough. The court recognized as a general rule that "a declaration in a grant to a corporation that land is conveyed for certain purposes does not necessarily import a limitation of the fee," and that the phrase "for purposes of wharf" in the absence of any provision for "a forfeiture or termination of the estate" or of any "words which must be taken as a condition" could not be construed as a limitation of the estate. The case has no application to the situation of lot owners in a cemetery arising from their contractual rights as such with the owner of the cemetery or from their ownership in fee of burial lots. In Burton's Appeal, 57 Pa. 213, a religious corporation applied to the court of common pleas for the sale of real estate owned by it for the payment of its debts and a sale was accordingly ordered and made pursuant to the provisions of the Pennsylvania statute of April 18, 1853 (P. L. 503), which expressly authorized the same. In Stuart v. Easton, 170 U. S. 383, 18 Sup. Ct. 650, 42 L. Ed. 1078, a Pennsylvania statute provided that a lot of land should be acquired in fee "in trust, and for the use of the inhabitants of the said county [Northampton], and thereon to erect and build a court house and prison, sufficient to accommodate the public service of the said county, and for the ease and convenience of the inhabitants." Subsequently a patent was executed for the lot in fee, "in trust, nevertheless, to and for the erecting thereon a court house for the public use and service of the county, and to and for no other use, intent, or purpose whatsoever." A court house was built upon the lot and remained there until 1862 when it was removed. Entry was made and an action of ejectment was subsequently brought by the sole heir of the original grantors for the recovery of the possession of the lot for breach of an alleged condition as to its use. The court, among other things, said:

"The proper construction of the patent in question is free from difficulty when construed in connection with the act of the assembly to which the patent refers. The act of 1752 constituted the authority of the trustees for acquiring the land in question, and that authority was to the individuals named in the act 'to purchase and take assurance to them and their heirs of a piece of land situate in some convenient place in the said town of Easton, in trust

and for the use of the inhabitants of the said county.' * * * The provision following the authorization to acquire the land, 'and thereon to erect and build a court house and prison,' was no more than a direction to the trustees as to the mode of use to be made of the land after it had been purchased."

The question in the case was one of condition subsequent between the heir of the original grantors and the public, and, as stated in connection with Riggs v. New Castle, the decision is inapplicable to lot owners in a cemetery. Wright v. Morgan, 191 U. S. 55, 24 Sup. Ct. 6, 48 L. Ed. 89, recognizes the doctrine of Stuart v. Easton, but does not apply to the facts in the present case. Rawson v. Inhabitants of School District No. 5 of Uxbridge, 7 Allen (Mass.) 125, 83 Am. Dec. 670, was a writ of entry to recover land in Uxbridge. The demanded premises were included in a deed to the inhabitants of Uxbridge, dated March 20, 1737, "to have and to hold the said given and granted premises, with all ye appur<sup>ces</sup>, and priviledges and commodities to the same belonging or in any wise appertaining, to the said town of Uxbridge forever, to their only proper use, benefit and behoofe, for a burying-place forever." The town entered upon the conveyed premises and occupied the same for a burial place for many years. In 1860 the town after a vote for that purpose sold the premises and the purchasers entered upon and enclosed the same "within their schoolhouse lot, and removed the remains of persons buried there, and lowered the grade of the earth, and appropriated the land to use for school purposes, and no other." It was held that the demandant was not entitled to recover possession of the premises as the conveyance was not upon a condition subsequent. In Hopkins v. Grimshaw, 165 U. S. 342, 354, 17 Sup. Ct. 401, 41 L. Ed. 739, the above case was distinguished from that before the Supreme Court; but wholly aside from this circumstance the Massachusetts case did not present or involve any controversy between owners or holders of burial lots and those seeking to dismantle or injure the same or remove remains therefrom. Krauczunas v. Hoban, 221 Pa. 213, 70 Atl. 740, was decided under the Pennsylvania statute of April 26, 1855 (P. L. 328), and does not bear upon the present case. In State v. Wiltbank's Adm'r, 2 Harr. (Del.) 18, it was held that a "devise" of money arising from land "to the trustees of the Methodist Episcopal Church in Dover, by whatever name or style they may be known in law, to be by the said trustees of the said M. E. Church applied in such manner as they shall devise, towards educating poor children of members of said church," was void; that it could not take effect under the act of February 3, 1787, as under it "all devises of land to religious corporations are void"; nor could it be sustained under the act of 17 Geo. II, on the ground of its being a devise for charitable purposes,

"for by the 4th section of that act it declared, that such societies, or any persons in trust for them or to their use, shall not be authorized by that act to take or receive any lands, etc., by gift, grant, or otherwise, for or towards the *maintenance* or *support* of the said churches, houses of worship, *schools*, or almshouses, or the *people belonging* to the same, or for any *other use or purpose*, save for the *uses in that act mentioned*. * * * Under the act of Geo. II, such a corporation had the political capacity to take lands by devise, prior to the act of 1787: it authorized them to take in this way, for certain pur-

poses which are enumerated, and for certain purposes only; the maintenance and support of schools is not one of these purposes, and is so expressly declared."

In my opinion State v. Wiltbank's Adm'r has no application to a conveyance in 1737 to unincorporated trustees of an unincorporated religious society of land for the pious and charitable use of a burial ground in perpetuity.

Griffitts v. Cope, 17 Pa. 96, and several other decisions cited by the defendants recognizing the doctrine there laid down form a class by themselves. That case was an action of ejectment brought to recover possession of certain real estate on the ground that the trust or charity on and for which it had been devised had been abandoned by the donees. The nature of the devise was stated by the court as follows:

"Striking out the machinery by which this devise is to be effectuated, we discover that the substance of it may be stated as follows: If the Quaker Meeting shall agree in good faith to accept the lot on Pine street, for the purpose of building a Meeting-house upon it, then I devise the same to them and their successors. Both the language of the devise and the influence of the act of 1731, for enabling religious societies to hold land, constrain us to consider this lot as given and accepted for a place of religious worship. * * * Let it be remarked, that a conveyance of land to a religious society implies a religious use, and that, by our act of 1731, a religious society could hold to no other use. * * * All religious societies hold land for a qualified purpose, because the law does not allow them to hold for general purposes. But this qualification has place only as between the public and the holders, and not between the grantors and the holders. It is not a qualification of the estate as granted, but of the uses to which, in such hands, it may lawfully be applied. It is not intended to prevent alienation to general purposes, but to prevent a religious society from using land for general purposes. It defines a duty of religious societies to the state, not to their grantors. The use to which the granting clause declares'that this land is to be applied is of the character which the law requires, and is the most ordinary purpose for which religious societies require land. The presumption would therefore appear fair and obvious, that, by that declaration, the devisor merely meant to make the grant lawful upon its face. This construction fully satisfies all parts of the devise. The devisor uses words of fee simple; and the other words, that truly describe all such estates in such hands, cannot be construed to reduce a fee simple to a qualified fee. To produce this effect it is necessary that other words be added, showing clearly that the testator intended that the land should revert on the abandonment of the particular use. These grants are, as between the grantor and grantees, fees simple, and as between the trustees and beneficiaries they are trusts."

These views were prefaced with the statement that

"our law discourages the fettering of estates and putting them into mortmain, and therefore favors the construction which relieves from restraints upon alienation."

It was held that the plaintiffs were not entitled to recover as title had passed to the purchaser from the Monthly Meeting. The doctrine of Griffitts v. Cope involves the proposition that in Pennsylvania since the passage of the act of February 6, 1731 (1 Smith's Laws, p. 192), which is similar to the Delaware statute of 1744, a grantor, in conveying land in fee to a religious society or corporation for expressed charitable or religious uses for which the society or corporation is authorized to hold and employ land, will, in the absence of clear evidence to the contrary, be presumed to intend, not to impress 'by his con-

veyance upon the land a charitable or religious use, but to vest the land in the society or corporation in fee subject to alienation by it for general purposes, but which, so long as not aliened, shall be used only for the purposes for which under the law of its being it is empowered to use and employ land. It is not denied in Griffitts v Cope or kindred cases that by the use of suitable terms land may be conveyed to an incorporated religious society to be held in perpetuity for a pious or charitable use falling within the corporate purposes in such manner that an abandonment of the use may either constitute a breach of a condition subsequent or give rise to a resulting trust. But it must be clear that such was the intention of the grantor. Presumptively no religious or charitable use is created by the grantor, but whatever use of the kind exists results from the ownership of the land by the society or corporation, and its necessary subjection to the purposes, limitations and restrictions imposed by the law of its being. I do not see how the doctrine of Griffitts v. Cope can apply to this case. For, as before stated, more than six years before the enactment of the Delaware statute of 1744 an admittedly charitable or pious use in perpetuity was created by the conveyance from Stidham; and when that act was passed, ratifying and confirming that conveyance "according to the true intent and meaning" of the same, the land continued impressed with the trust and use created by Stidham (Stockton v. Newark, 42 N. J. Eq. 531, 539, 9 Atl. 203), and was not destroyed by that act, as would necessarily have been the case had the doctrine of Griffitts v. Cope been applicable and operative. Further, that case did not deal with a burial ground or cemetery or the rights acquired by individuals to sepulture therein.

I recall no case in which it has been held that the title of a burial lot owner under a deed in fee to him for burial purposes can be destroyed or taken from him unless under the police power, the right of eminent domain, or a statute explicitly authorizing it, enacted in the exercise of the legislative power over charitable uses. In Trustees for Baptist Church v. Laird (Del. Ch.) 85 Atl. 1082, specific performance was decreed of an agreement to purchase land held for church and burial purposes. There was, however, "no allegation or evidence that the land had been used as a burial place." Further the Delaware statute of April 6, 1911, 26 Del. Laws, ch. 252, provided that the trustees of the church, who were then "the duly elected and constituted trustees under the trusts contained" in the original conveyance from Joseph Stidham and his wife,

"are hereby authorized and empowered to sell, either at public or private sale, on such terms as they may deem expedient, all or any part of the tracts, pieces or parcels of land belonging to, or held in trust for the members of The First Baptist Church of the Borough of Wilmington, and described in the two indentures recited in the preamble to this act, and convey the same, in fee simple, to the purchaser or purchasers, by good and sufficient deed or deeds, free from all trust, and without any liability on the part of said purchaser or purchasers for the application, non-application or mis-application of the purchase money. The net proceeds of said sale or sales, after paying costs thereof, and any liens of record against said property, shall be held by the said trustees and their successors in office hereafter, under and subject to the same

trusts and for the benefit of the same persons as are set forth and provided in and by the said indenture executed by Joseph Stidham and Rebecca Stidham, his wife."

With respect to this statute it may be said that it amounts to a declaration by the law making body of the necessity or propriety of suitable legislation in such a case, and further, that it recognizes that the trustees of the church were the trustees "under the trusts contained" in the original conveyance from the Stidhams. In First Presbyterian Church of Wilmington, Delaware, Incorporated, v. Bailey, supra, it was decided that the corporation defendant had power to grant and convey to Bailey in fee, clear of incumbrances, the portion of the cemetery contracted to be sold to him, together with the easement above described. I do not think that decision controls the present case. The complainants here were not parties to that suit nor in any legitimate sense represented by the corporation defendant; for it was there attempting to disregard the pious or charitable use for the protection and preservation of which the complainants here now sue. Further, there was no statement in the bill or evidence in that case that the property in question had been used as a burying ground, or that the ground covered by the agreement had any buildings erected on it; nor was there any statement or evidence as to the use which the purchaser was to make of the land. In Trustees for Baptist Church v. Laird reference was made to section 4 of the Delaware statute of March 22, 1887, as subsequently amended. 20 Del. Laws, ch. 115. The title of the chapter is "Of the settlement of personal estates," and that of the statute "An Act concerning investments by guardians and trustees." Section 4 is as follows:

"Section 4. That upon petition of any trustee having the legal title to any property, real, personal, or mixed, setting forth that the sale and conversion thereof would be beneficial to the persons interested in the trust, the Chancellor may, by order made thereon in his discretion, authorize and direct such trustee and (to?) sell the whole, or so much as may be proper, of such trust property, and to transfer and convey the same to the purchaser thereof, absolutely and in fee simple, freed from any trust and without liability on the part of such purchaser as to the application of the purchase money; provided, that in cases where the sale or conversion of trust property has been or may be expressly prohibited by the instrument creating the trust, no sale or conversion shall be taken to be hereby authorized; and provided, moreover, that the proceeds of all sales made under the authority of this act shall be held under and subject to the same trusts as those to which the property sold was subject, and in cases where real property is to be sold the trustees thereof shall first give sufficient bond, with surety to be approved by the Chancellor, for the preservation and protection of the proceeds of such sales for the purposes of the trust and subject to the orders and decrees of the Chancellor in the premises."

Palpably this section has no application to the case of rights acquired by individuals to sepulture, vaults, tombs, monuments, etc., in a burial ground or cemetery. The Chancellor did not hold that it had such application, for "there was no allegation or evidence that the land had been used as a burial place." Further, the section is restricted to the case of the "petition of any trustee * * * setting forth that the sale and conversion * * * would be beneficial to the person interested in the trust." To seek to apply it to burial rights and prop-

erty acquired and held by individuals in the cemetery of the corporation defendant would not only be repugnant to the plain sense of the section, but at variance with the contention that under the doctrine of Griffitts v. Cope the original charitable use or trust has been superseded by corporate ownership for the religious or charitable purposes for which land can be held. For under that doctrine the trustees of the religious corporation could not constitute a "trustee" in the sense in which that word is employed in section 4. Again, the section contemplates that the sale and conversion authorized by it "would be beneficial to the person interested in the trust." The phrase "person interested in the trust" as employed in the section can have no application to a person who has as an owner or holder of a burial lot acquired a legal right to enjoy the same through contractual relations with the religious society or corporation on which has devolved the general superintendence and administration of the charitable use or trust. And it is proper to add that the conversion authorized by the section is one "beneficial to the person interested." The change of trust investments for the benefit of the cestui que trust clearly comes within the jurisdiction of chancery; but obviously the principle cannot be applied to deprive individuals against their consent of burial rights legally acquired in a well-ordered cemetery. It is precisely the lot, the vault, the monument, etc., and not any income or revenue therefrom, or any substitution therefor, which the lot owner is entitled to hold and enjoy in the cemetery of the corporation defendant, and I think it would be a perversion of language to assert that the destruction of that right and the substitution of something else would amount only to a conversion within the meaning of section 4.

It was admitted during the oral arguments that the corporation defendant could not deprive those holding burial lots in which interments have been made of the right to maintain the same, unless upon the making of compensation in some form or furnishing suitable burial lots elsewhere for the reception of the remains which may be removed from the existing cemetery. But this cannot be effected in the absence of proper legislative authority, save by consent.

On the whole I am satisfied that the showing made by the complainants is such as to justify and require the awarding of a preliminary injunction to maintain the status quo until the case can be finally disposed of on plenary pleadings and proofs. An interlocutory decree for the complainants in accordance with this opinion may be prepared and submitted.