In re R. S. GRIST COMPANY et al., Debtors.

WATERSIDE APARTMENTS, INC., Plaintiff,

v.

Justin P. HAVEE, etc. et al., Defendants.

Bankruptcy Nos. 80–00480–BKC–SMW, 80–00481–BKC–SMW.
Adv. No. 80–0122–BKC–SMW–A.

United States Bankruptcy Court, S. D. Florida.

Oct. 28, 1980.

John L. Britton, Miami, Fla., for Waterside Apts.

Louis Phillips, Miami, Fla., for Interim Trustee.

Justin P. Havee, Miami, Fla., for Interim Trustee.

Timothy J. Norris, Miami, Fla., for Chase Manhattan Bank.

Russell E. Brooks, New York City, for Chase Manhattan Bank.

Richard Maidman, New York City, for R. S. Grist Co.

Leo Greenfield, North Miami, Fla., for R. S. Grist Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SIDNEY M. WEAVER, Bankruptcy Judge.

These causes came on to be heard upon Plaintiff's complaint to obtain injunctive and other relief and the counterclaim of the Defendant The Chase Manhattan Bank, N.A. ("Chase") and upon the verified application of Chase filed in the case of Waterside Towers, Inc., Case No. 80–00481–BKC–SMW. They were tried by the Court on June 26 and 27, and on August 8, 12 and 14, 1980. The Court, having heard the testimony and examined the evidence presented, having observed the candor and demeanor of the witnesses, having considered the arguments of counsel, and being otherwise

fully advised in the premises, does hereby make the following findings of fact and conclusions of law:

On April 28, 1980, Chase filed an involuntary petition under Chapter 7 of the Bankruptcy Code against Waterside Towers, Inc. On that same day, Chase also filed involuntary petitions under Chapter 7 against R. S. Grist Company, Irvin Freedman, and Grace Freedman; all four cases were directed to be jointly administered by an Order of this Court dated April 28, 1980. Immediately upon filing of the petition, Chase moved for and obtained the ex parte appointment of an interim trustee for each of the four estates, and Justin P. Havee was accordingly appointed interim trustee and at all material times has been the interim trustee for the estate of Waterside Towers, Inc. Thereafter, on May 22, 1980, Chase filed a Verified Application seeking to have the petition filed against Waterside Towers, Inc. amended to be deemed to have been filed against Waterside Apartments, Inc. and to have the order appointing Justin P. Havee as interim trustee amended to provide that he be appointed interim trustee for the estate of Waterside Apartments, Inc. On the same date, Waterside Apartments, Inc. filed its complaint to obtain a declaration that Chase and Justin P. Havee have no right, title, or interest in the property of Waterside Apartments, Inc., to enjoin Justin P. Havee from interfering with the property of Waterside Apartments, Inc., and for damages caused by the interference of Chase and Justin P. Havee with the property of Waterside Apartments, Inc. Because the legal and factual issues of the complaint, the counterclaim, and the verified application are the same, the Court tried the matters together and is here entering common findings of fact and conclusions of law.

This Court has jurisdiction of this case under 28 U.S.C. § 1471(a) and has jurisdiction of the adversary proceeding under 28 U.S.C. § 1471(b).

The Plaintiff Waterside Apartments, Inc. ("Waterside Apartments") is a Florida corporation with its principal place of business in Dade County, Florida. The Defendant Chase is a national banking association located in New York, New York, and the Defendant Justin P. Havee is the duly appointed qualified and acting Interim Trustee for the estate of Waterside Towers, Inc.

The focal issue presented to the Court is whether Chase holds a claim against Waterside Apartments or, phrased differently, whether Waterside Apartments is the alleged debtor in the Waterside Towers, Inc. bankruptcy case. This Court concludes that Chase does hold a claim against Waterside Apartments and that Waterside Apartments is the alleged debtor in the pending bankruptcy case of Waterside Towers, Inc.

The center of attention of this case is Waterside Towers, an 118-unit apartment building located at 2450 Northeast 135th Street in North Miami, Florida. At the time this bankruptcy case was instituted, the building was being converted into a condominium with sales, marketing, and management being provided by Keyes Management Company. The building had been conveyed to Waterside Apartments, Inc. on May 18, 1979, by the reorganization trustee of Tower 2450, Inc. in another bankruptcy case pending before this Court.

Initially in this case, there was confusion and uncertainty over whether there was an alleged debtor in existence—although the involuntary petition under Chapter 7 was filed against Waterside Towers, Inc., it turns out that there is no entity with that name. However, the evidence clearly has established that Waterside Towers, Inc. is the same corporation as Waterside Apartments, Inc. and that the confusion arose due to the fact that the officers of Waterside Apartments, Inc. as well as persons from Keyes Management Company and others who dealt with Waterside Apartments, Inc. used variations of the name "Waterside" to denominate the corporation and its primary asset, the building. The evidence raised no question whether the term "Waterside Towers, Inc." could apply to any entity other than Waterside Apartments, Inc. Accordingly, this Court finds

that the term "Waterside Towers, Inc." is merely a misnomer for the corporation Waterside Apartments, Inc. and that the corporate entity Waterside Apartments, Inc. is the alleged debtor in this bankruptcy case.

The significance of the misnomer in this case is that Chase holds a note in the amount of $2.96 million executed in the name of Waterside Towers, Inc. This note is supported by a corporate resolution in the name of Waterside Towers, Inc. executed by the officers of Waterside Apartments, Inc. In addition, Chase holds a guaranty of Sandy Brous, a vice president of Waterside Apartments, referring to an obligation of "Waterside Towers, Inc." as well as a guaranty of R. S. Grist Company also referring to an indebtedness of "Waterside Towers, Inc." Of course, this misnomer does not affect the validity of the loan documentation. The case law of Florida, as well as general common law throughout the United States, is that an instrument will be enforced against a misnamed corporation if the identity of the corporation can be determined with certainty. *Morton v. Mercantile National Bank of Miami Beach*, 185 So.2d 172 (Fla. 3d DCA 1966); *American Ladder & Scaffold Co. v. Miami Ventilated Awning Co.*, 150 So.2d 268 (Fla. 3d DCA 1963). "[I]t is well settled that so long as the corporate entity is the same, its acts and deeds are not vitiated by [a minor] departure from the corporate name. Absolute accuracy in the corporate name or title is not essential to a valid exercise of corporate power...." *Chew v. First Presbyterian Church*, 237 F. 219, 234 (D.Del.1916). *See also Elbert v. Wilmington Turngemeinde*, 7 Boyce 355, 30 Del. 355, 107 A. 215 (1919); *St. Matthew's Evangelical Lutheran Church v. United States Fidelity & Guaranty Co.*, 222 Mich. 256, 192 N.W. 784 (1923). These cases demonstrate that of primary significance is whether the misnamed party can be identified with sufficient certainty to distinguish it from other possible parties.

In this case, from the evidence presented, it is clear, and the Court so finds, that the misnamed party to the loan documentation is Waterside Apartments, Inc.

This, however, is not the end of the matter. Waterside Apartments, Inc. also has asserted that the loan documentation was forged by officers of Chase; or that the persons who executed the loan documentation had no authority from the corporation to execute the documentation; and, finally, that there was no consideration for the obligation. The balance of the credible testimony and the documents in evidence, however, negate each of these contentions.

■ The Court finds that the evidence Waterside Apartments presented did not prove[1] that any of the documents were forged, let alone forged by Chase. On the contrary, the evidence compels the finding that the essential documents are genuine and that no forgery can be attributed to Chase.

First and foremost, there was no direct testimony of any forgery by Chase. Those inferences which counsel for Waterside Apartments tried to draw in order to fill the gap had little or no basis in the evidence. Moreover, the Court finds that those inferences are not credible in the light of the demeanor of the witnesses and the undisputed aspects of the case.

The sole document upon which Waterside Apartments sought to place significant reliance is a financial statement which purports, on its face, to have been prepared by a Miami accounting firm, Leader & Levi. A partner in that concern denied that it had issued the document. On the other hand he testified that the firm did prepare financial statements for the Freedmans and R. S. Grist Company, all participants in the loan transaction. But he also testified that these documents were never delivered to Chase. Thus the question of the origin of the financial statement remains unclear.

---

1. The burden is on the party challenging the authenticity of a signature, which on its face appears to be genuine, to prove conclusively that the signature is a forgery. *Freeman Check Cashing Inc. v. State*, 97 Misc.2d 819, 412 N.Y. S.2d 963 (Ct.Cl.1979); *Virginia National Bank v. Holt*, 216 Va. 500, 219 S.E.2d 881 (1975); *Jax v. Jax*, 73 Wis.2d 572, 243 N.W.2d 831 (1976).

Yet if one assumes that Leader & Levi did not prepare the financial statements, Waterside Apartments still has failed to demonstrate just who *did* prepare it. The document, after all, could have been written by the principals of Waterside Apartments just as well as by Chase; or for that matter, by third parties for reasons of their own.

Furthermore, when the other documents in evidence are considered in the light of the testimony which the Court heard and observed, they are sufficient to bind Waterside Apartments. Specifically, the record includes a $2.96 million note in the name of Waterside Towers, Inc., a corporate resolution authorizing the execution of the note, guarantees executed by R. S. Grist Company, by Arthur and Symee Greenfield (president and secretary, respectively, of Waterside Apartments), and by Sandy Brous, and a new account signature card for the checking account to be opened at Chase in connection with the loan.

The signatures on each document appear regular on their face. Symee Greenfield authenticated the signature of Sandy Brous on the note. Mr. Brous also submitted to Chase a personal guaranty of the indebtedness and signed the new account card as vice president. Moreover Mr. Brous signed the guaranty of the Waterside Apartments obligation by R. S. Grist Company and the corporate resolution of Waterside Apartments authorizing the president or vice president, acting individually, to borrow money and obtain credit on behalf of the corporation.

Symee Greenfield and Arthur Greenfield testified that they too signed the corporate resolution authorizing the borrowing, as well as a personal guaranty of the obligation. Symee Greenfield also signed the new account signature card.

Irvin Freedman was in control of the R. S. Grist Company and, until March, 1980, in control of Waterside Apartments. He testified that the Waterside note had been executed by Arthur Greenfield rather than by Sandy Brous. On the totality of the evidence, the Court must reject his testimony

on this point. Mr. Brous' signature is on the note and has not been questioned by any handwriting expert. On the contrary, the Greenfields, themselves also officers of Waterside Apartments, have authenticated that signature under oath. Furthermore, Mr. Brous also signed other documents which would logically complement the note. In any case, Mr. Freedman's contention does not defeat Chase's claim. Even if the note had been signed by Arthur Greenfield, the president of Waterside Apartments, and had been lost, the result would be the same. Waterside Apartments intended to and did enter into an obligation to pay $2.96 million to Chase.

Waterside Apartments' alternative argument that the persons who signed the loan documents had no authority to do so requires the Court to delve more deeply into the murky history of the corporation.

Early in 1979, Tower 2450, Inc., the company which then owned the apartment building was in a Chapter X proceeding. Irvin Freedman, who was attempting to acquire the building, engaged Sage Capital Corp. ("Sage") to locate financing. Sage, through its president Daniel Segal, submitted a loan application to Aetna Business Credit, Inc. ("Aetna"), but Aetna refused to make a loan to a corporation controlled by Freedman because of his poor credit rating. Daniel Segal then conferred with Freedman and with his brother Alan Segal, also an officer of Sage. Together they devised an arrangement whereby a newly-formed corporation would borrow the funds from Aetna and the stock of the corporation would be held by Daniel Segal as a nominee. On April 19, 1979, an application was submitted by Sage to Aetna on this basis. On the same day, Aetna approved the application on the condition that all of the stock of the borrower corporation be owned by Daniel Segal and that the stock be pledged to Aetna to secure Daniel Segal's non-recourse guaranty of the loan.

There was another unusual transaction between Irvin Freedman and Sage on April 19, 1979. At Freedman's request, Daniel Segal "cracked" a Chase cashier's check for

$375,000.00 made payable to Sage by opening a new account at Nordic American Bank with the check and then drawing two checks on the account totalling $375,000.00 —one payable to Chase for $250,000.00 and one payable to Steven Markelson and Martin Schwarzman for $125,000.00. The Court heard no satisfactory explanation for the "cracking" of the check and was left to speculate whether, or how, this occurrence tied in to the Aetna loan application.

Be that as it may, on May 25, 1979, the Aetna loan was closed. Daniel Segal executed the required stock pledge, but there apparently was a lack of communication between Daniel Segal and Irvin Freedman about the number of shares of Waterside Apartments stock which had been issued and to whom. In any event, Daniel Segal received five stock certificates in varying amounts of shares, all in his name, on June 25, 1979, under cover of a letter from Leo Greenfield, Freedman's attorney. Daniel Segal signed the letter, which acknowledged that Segal was holding the stock as a nominee until the Aetna loan would be repaid, at which time he would endorse each of the certificates to the appropriate beneficial owner of the stock.

■ At the end of August, 1978, Daniel Segal attempted to vote the stock to make himself the sole director and himself and his brother Alan Segal the officers of Waterside Apartments. Segal's right to effectuate a change in management was disputed by Leo Greenfield. Segal in fact never gave written notice to any of the officers whom he presumably was removing from office, although Segal testified that he told Sandy Brous that he was fired during a stormy meeting at the Waldorf Astoria Hotel in New York City in September, 1979. However, a few weeks later, on October 13, 1979, Brous, on behalf of Waterside Apartments, executed an agreement, also executed by Daniel Segal, which confirmed that the management of Waterside Apartments by Brous and the Greenfields would continue in effect. Furthermore, Brous and the Greenfields continued to act as officers of Waterside Apartments. After assessing all the testimony, the Court finds that Brous and the Greenfields did not receive adequate notice of the revocation of their authority. In the absence of that notification, a corporate officer continues to have the authority to bind the corporation. *See Best v. Gunter*, 125 Wis. 522, 104 N.W. 82 (1905). *See also United States v. Summit Fidelity & Surety Co.*, 408 F.2d 46 (6th Cir. 1969). Notice to a third party, such as Leo Greenfield, is not effective to revoke an agent's authority. *Florida-Georgia Chemical Co. v. National Laboratories, Inc.*, 153 So.2d 752 (Fla. 1st DCA 1963).

■ Furthermore, Mr. Brous and the Greenfields continued to act on behalf of Waterside Apartments, signing contracts and remaining the authorized signatories on the checking account. This, combined with the Greenfields' continued residence at Waterside Towers rent-free, was sufficient to establish their apparent authority.

In addition, under the terms of the agreement by which Daniel Segal held the stock of Waterside Apartments as nominee he had no authority to change the management of Waterside Apartments. Daniel Segal's testimony that he was to receive full ownership of all of the stock of Waterside Apartments (rather than holding it as nominee) as the broker's commission due Sage for arranging the Aetna loan lacks credibility, and the Court rejects it.

The third defense offered on behalf of Waterside Apartments consists of an argument that there is no consideration to support the $2.96 million note held by Chase because no new funds were given to Waterside Apartments and the loan instead was to pay a pre-existing debt. This argument also fails.

■ The $2.96 million loan from Chase was used to pay existing debts of R. S. Grist Company to Chase which totalled $2.96 million. Accordingly, Chase took the $2.96 million note for value, and the defense of lack of consideration is not available to Waterside Apartments. Sections 3–303(b) and 3–408, Uniform Commercial Code. *See Offi-*

cial Comment 5 to Section 3–303 [2] and Official Comment 2 to Section 3–408,[3] Uniform Commercial Code. Furthermore, the $2.96 million loaned to R. S. Grist Company was used, at least in part, to finance the acquisition and conversion of the building. Thus the evidence shows, and the Court finds, that at least $1.8 million of the Chase loan proceeds was used to finance the acquisition of Waterside Towers and the condominium conversion, directly benefitting Waterside Apartments. Furthermore, Waterside Apartments and Daniel Segal acknowledged the obligation by executing, on October 13, 1979, an agreement which recited that $2.96 million was to be repaid out of proceeds of sales of condominium units. Although Daniel Segal denies that he knew the funds were destined for Chase, his attorney, Morris Brown, identified his (Brown's) handwriting in a prior draft of the agreement which clearly stated that the $2.96 million was owed to Chase.[4]

Waterside Apartments' plea that equity should refuse to recognize Chase's claim against it is primarily based upon Daniel Segal's assertion that he and Sage borrowed substantial funds from Chase which were re-loaned to Irvin Freedman and others at the insistence of a Chase officer and that these loans were not paid, thus somehow entitling Segal to prevail over Chase because of this investment. Likewise, Waterside Apartments urges that this investment should be recognized in equity to deny Chase's claim against Waterside Apartments. However, the Court finds that the most money that Daniel Segal or Sage invested for the benefit of Waterside Apartments is approximately $83,000.00 paid for some taxes. Daniel Segal testified that a Chase officer, Michael Calandra, agreed to loan him and Sage funds but insisted they borrow extra amounts to loan to Freedman and others. According to Segal, Calandra, who since has been terminated by Chase, also stated that Chase would credit their accounts if Freedman and the others failed to pay the loans. Segal testified that these transactions were plausible, although not normal. That these transactions would be plausible is inconceivable to this Court, particularly from the perspective of a person such as Daniel Segal who holds himself out as a sophisticated businessman. Segal must have known that this scheme was improper for a bank officer to propose or authorize.

These loan transactions are irrelevant to the Waterside Apartments loan transaction; they are loans unrelated in any way with Waterside Apartments but involving some of the same characters as are involved with Waterside Apartments. Furthermore, Daniel Segal realized that these unrelated loan transactions really were devices to disguise the identity of the true borrowers from Chase, and he voluntarily participated with Calandra in making the loans. Accordingly, equity will not lend its aid to Daniel

2. "Paragraph (b) ... adopts the generally accepted rule that the holder takes for value when he takes the instrument as security for an antecedent debt, even though there is no extension of time or other concession, and whether or not the debt is due. The provision extends the same rule to any claim against any person; there is no requirement that the claim arise out of contract. In particular the provision is intended to apply to an instrument given in payment of or as security for the debt of a third person, even though no concession is made in return."

3. "The except clause is intended to remove the difficulties which have arisen where a note or a draft, or an indorsement of either, is given as payment or as security for a debt already owed by the party giving it, or by a third person. The provision is intended to change the result of decisions holding that where no extension of time or other concession is given by the creditor the new obligation fails for lack of legal consideration. It is intended also to mean that an instrument given for more or less than the amount of a liquidated obligation does not fail by reason of the common law rule that an obligation for a lesser liquidated amount cannot be consideration for the surrender of a greater."

4. Although Morris Brown denied that he was acting as Daniel Segal's attorney, the other participants in the drafting process of the October 13, 1979 agreement, identified Morris Brown as Segal's attorney. From the weight of the evidence, the Court finds that Brown acted as Daniel Segal's attorney in the drafting of the October 13, 1979 agreement.

Segal or Waterside Apartments. Furthermore, the conduct of Chase officers with respect to these unrelated transactions does not detract from the validity and enforceability of the Waterside Apartments obligation to Chase nor does it change the fact that substantial sums loaned by Chase were used for the benefit of Waterside Apartments.

The Court will enter an order granting Chase's application to amend the petition and a judgment dismissing the complaint with prejudice and in favor of Chase on its counterclaim.