HILL, ᴇᴛ ᴀʟ. *v.* TOWSON REALTY, INC., ᴇᴛ ᴀʟ.

[No. 96, September Term, 1959.]

390

*Decided February 11, 1960.*

The cause was argued before BRUNE, C. J., HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*John Warfield Armiger,* with whom was *John Grason Turnbull* on the brief, for the appellants.

*Richard C. Murray* and *W. Lee Harrison,* with whom were *Paul J. Wilkinson, William B. Kempton* and *Sidney Blum* on the brief, for the appellees.

PRESCOTT, J., delivered the opinion of the Court.

Complainants' bill in equity seeking an injunction to prevent the use of any part of a sixteen-acre parcel of land for any purpose other than the burial of the human dead and to require the appellees to vacate and remove structures theretofore erected or being erected thereon was dismissed, the chancellor finding that there had been no "dedication" of the entire sixteen acres for the purposes of a cemetery; that there was no "intention of reverter" evidenced in prior deeds transferring the property; and that there was, in fact, no impairment of the "integrity" of the portion thereof actually used as a cemetery.

In 1890, William Grason and wife (ancestors of the plaintiffs) deeded unto John and Henry Longnecker the entire sixteen-acre parcel of land. It is roughly triangular in shape, being bounded on the west by York Road, and on the east by Dulaney Valley Road, and it fans out as those two roads di-

verge northward from the center of Towson. This deed conveyed the property in fee simple and contained no restrictions or reservations, nor did it provide for any possibility of reverter or right of re-entry. However, the being clause contained a recital, which, in part, stated:

> "Being part of that * * * land which * * * was allotted to Benjamin Chew (upon condition that the said lot or parcel of land is to be used and maintained as a cemetery). * * * it being the intent of the parties hereto that said tract of land is to be kept and maintained as a cemetery."

On November 25, 1891, the Prospect Hill Cemetery Company of Baltimore County was incorporated and it held title to the tract from December 7, 1891, until January 22, 1941, when it conveyed the same to Erwin Huber and Ethel B. Huber, his wife. There was no testimony with respect to the subject property for the 50 years this corporation was in title, other than offering into evidence a duplicate register of certificates for cemetery lots. The same form of certificate is still in use although the name of the cemetery has changed several times. These certificates purport to convey to the purchaser a lot of ground in the cemetery with the following habendum clause:

> "To have and to hold the herein above granted land and premises, unto the said ............, his heirs and assigns, forever, in fee, *for the purpose of sepulchre only;* subject, * * * to such rules and regulations of said Company as are now in force, and to such other rules and regulations as may hereafter be adopted for the management of said Company and said Cemetery; * * *." (Italics supplied.)

The certificates were signed in each instance by the president of the then cemetery company and witnessed by the secretary, but none was acknowledged.

Subsequent to the acquisition of this tract by the Hubers in 1941, an annual and perpetual care schedule was adopted which reflects the fact that lots sold prior to that time did

not include any perpetual care, but such lot owners had been charged an annual fee for upkeep. The Hubers also adopted a schedule of burial charges effective December 1, 1946, and in January, 1941, had adopted rules and regulations which show that Mrs. Huber was the "operating owner" of the property, and Mr. James H. Hope was the manager. These rules and regulations reflect the right of the ownership to regulate the cemetery in all respects.

On February 2, 1954, Mrs. Huber (then a widow), her son and daughter formed a corporation known as Prospect Hill Park, Inc., and on February 5th of the same year caused the property to be transferred to that corporation. This deed contained the usual warranties and was subject only to "the rights of the owners of all lots heretofore sold for burial purposes." On March 4, 1954, a portion of the northernmost part of the tract was sold to Baltimore County, Maryland, for the construction of the new Towson Beltway.

The corporation re-conveyed the balance of the tract to Mrs. Huber individually on July 29, 1957. Mrs. Huber next conveyed approximately 11 acres of the tract to L. Scott Brooks and wife on July 31, 1957, and later conveyed the 4 acres here involved to Towson Realty, Inc., on April 22, 1958. She finally sold the remaining portion of the original tract to the Towsontown Motor Hotel Corporation on November 6, 1958. Since the appellants complain that the original 16 acres has now been reduced to approximately 7 acres, it is important to note that this result was reached by the action of Mrs. Huber in conveying only 11 acres to Brooks some nine months prior to the deed to Towson Realty and the further action of Brooks in conveying only 7 of the 11 acres which he had received to a corporation known as "Prospect Hill Cemetery, Inc." as an operating company for the cemetery itself. The value of the improvements sought to be removed is in excess of $600,000.

The above summarizes a sufficient portion of the evidence to commence the consideration of the questions raised. More facts will be added as needed.

## I and II

The appellants' first two contentions may be combined for consideration. They argue (a) that "a recital in a deed specifying the use which may be made of a property is binding upon the parties thereto and their privies"; and (b) that "such recitals are effective means of demonstrating the owners' intention to dedicate and coupled with acceptance will constitute dedication."

### (a)

This contention of the appellants is, of course, based upon the recital heretofore quoted from the deed from the Grasons to the Longneckers in 1890. It is completely and fully answered by a line of Maryland cases, including *Columbia Bldg. Co. v. Cemetery,* 155 Md. 221, 141 A. 525. In that case, land of approximately the same area involved in the case at bar (about 16 acres) was conveyed, in fee simple, to a corporation, "subject nevertheless that * * * the said lands to be held and used by the Cemetery of the Holy Cross * * * as a cemetery for the burial of deceased Catholics on such terms, under such regulations and as the Cemetery of the Holy Cross, may hereafter agree upon and determine." After holding and using the land as a cemetery for more than fifty years, the corporate grantee agreed to sell a portion thereof and to convey the same in fee simple by a good and merchantable title to the purchaser. The purchaser refused to consummate the purchase, because of the above-mentioned proviso in the seller's deed. The court recognized that there is nothing unlawful in creating a condition subsequent in a deed, and, while conditions that tend to destroy estates are not favored in law, if the language used clearly and unmistakably indicates an intention to create a condition subsequent, the intention controls. The court pointed out, however, that there was nothing in the deed that indicated an intention on the part of the grantors that in the event changed conditions made it unwise or impracticable to continue to use the land or any part of it as a cemetery that it should revert to the heirs of the grantors if not so used, and held that the proviso was not enforceable as a trust, as a condition subsequent nor as a covenant, as it

amounted to no more than an expression of confidence, which the grantors had, that the grantee would use the property for the purpose of a cemetery so long as it was reasonable and practical to do so. See also, *Faith v. Bowles,* 86 Md. 13, 37 A. 711; *Rydzewski v. Vestry of Grace and St. Peter's Church,* 145 Md. 531, 125 A. 717. As in the *Columbia Bldg. Co.* case, there is nothing in the deed from the Grasons to the Longneckers that indicates any intention on the part of the grantors that in the event it became unwise or impracticable to use the land, or a part of it, as a cemetery that it should revert to the heirs of the grantors. We, therefore, think the recital involved in the instant case, also, amounted to no more than an expression of confidence, which the grantors had, that the land would be used for cemetery purposes as long as it was reasonable and practical to do so; and that it is not enforceable as a trust, as a condition subsequent nor as a covenant.

### (b)

This contention may be dealt with rather summarily. It is based entirely upon a supposed common-law *public* dedication of the sixteen acres for burial purposes. (Consisting of an offer to dedicate and its acceptance.) All of the authorities cited by the appellants under this heading deal with *public* dedications of small parcels of ground (approximately one-half acre or just a "lot") for the purpose of human burials. Of course, property may be dedicated for *public* use for the burial of the dead, *Boyce v. Kalbaugh,* 47 Md. 334, *Tracy v. Biddle,* 112 S. W. 45 (Mo.); but the appellants' difficulty in this regard is that there is *no* question of dedication for *public use* here involved. The evidence fails to show any claim by the public to the right of burial in the cemetery; the only persons entitled to use the cemetery for burial purposes were the individual lot owners, who *purchased* their lots from the cemetery owners.

Exactly the same proposition here raised by the appellants was thoroughly considered, discussed and decided adversely to the appellants' position by this court in *St. James African Methodist Episcopal Church v. Baltimore & O. R. Co.,* 114 Md. 442, 79 A. 472. Cf. Frank, *Title to Real and Leasehold Es-*

*tates,* pp. 189, 190; *Mayor & City Council of Baltimore v. Fear,* 82 Md. 246, 257, 33 A. 637; *Hackerman v. Mayor and City Council of Baltimore,* 212 Md. 618, 130 A. 2d 732. [Dedication must be to public generally, not to only a part thereof.]

### III

In this assignment of error, the appellants fail to make clear the point they attempt to make. They allege that "error was committed by the chancellor in refusing to consider early plats of the cemetery *as evidence of dedication,*" and conclude their argument thereon by saying, "[t]he witness' description of the permanence of the binding * * * together with the references to the plats in the office of the cemetery company * * * seems to afford convincing evidence that this exhibit [without naming it] * * * should be admissible under the shopbook rule," which clearly connotes a claim that an "exhibit" was not admitted into evidence. (Italics added.) The exhibit referred to was complainants' exhibit number 2. It was admitted into evidence without objection, (T. p. 9) and was considered by the chancellor, who referred to it in his opinion. If it be advanced as a further argument on the question of public dedication, we have already dealt with the same in (b) above.

### IV

The appellants, next, state that lot owners in a cemetery take "an instinctive right in, and are entitled to the maintenance of the integrity of the cemetery as a whole." They fail to state what an "instinctive" right is, but cite the case of *Chew v. First Presbyterian Church,* 237 Fed. 219 (D. C. D. Del. 1916), and quote from Jackson, *The Law of Cadavers* (2nd Ed.), 254 as follows:

"The lot owner is entitled also to have the integrity of the cemetery as a whole preserved. Hence it may properly be maintained that no part of the cemetery lands, whether burial rights therein have been sold or not, may be sold if *such sale* will be in derogation *of the lot owner's rights.*" (Italics added by us.)

This well-known author makes it perfectly clear at page 255 of this same text that alienation is permissible when the subtraction of unused land from a cemetery is not detrimental to the portion remaining.

If we accept, without deciding, what Mr. Jackson says as being the law on the subject now under consideration, we fail to see, in the light of the facts of this case, any impairment of the integrity of the remaining portion of the cemetery, or any derogation of the rights of any lot owner therein. The still remaining cemetery portion of the original sixteen acres consists of about seven acres. In it, since 1890, there have been some 3500 interments, and there remain approximately the same number of vacant lots for sale. These seven acres are about thirty-five feet above grade and as you approach the subject property, some distance to the north, there are two small sloping hillsides with the subject property some seven feet below grade.

There have never been any interments outside of the seven acres still maintained as a cemetery, nor have any sales of lots for burials been made outside thereof. The four-acre lot involved in this suit, which is well removed from the cemetery remaining, formerly was heavily wooded and described as swampy and as an extremely rough piece of property used for dumping purposes for 40 years, and overgrown with trees and underbrush. It had been rented to the Wayside Nursery and for some years used for commercial purposes. Also, there had been a caretaker's house on the northern end of the property which was torn down when the county obtained a portion of the former cemetery owner's land for highway purposes. The subject property has been zoned for commercial purposes for some time.

There have been numerous and extensive changes in the general neighborhood of the cemetery property, so that it is now in close proximity to many commercial enterprises. Among these changes are the building of Marsden Chevrolet on York Road, an increase in the Brooks Price Buick area on York Road, the construction of Hutzler Brothers' Store, the erection of the Shell Oil Company's office building and the construction of the Towson Plaza Shopping Center, Hampden

Apartments and the Dulaney Valley Apartments. In addition, Mr. Brooks has purchased the former Methodist Church, which is very close to the cemetery, and operates it as a funeral home, while McCurdy Avenue to the south contains a drive-in bank facility, a plumbing and heating establishment, an engineering office, the Steer Inn and Coffee Shop and an antique shop. The cemetery property sits well above grade and overlooks many of these uses.

As indicated above, this case does not involve the removal of any human remains, any tombstone, head marker or anything of that nature. It involves nothing but the use of a parcel of land that formerly was a portion of a tract owned by a private cemetery company. Without prolonging this opinion further, we repeat, in agreeing with the chancellor, that we are unable to discover, in the facts of this case, any undermining of the integrity of the cemetery or the infringement upon any rights of the lot owners therein.

The *Chew* case, *supra*, cited by the appellants is easily distinguishable upon the facts. The opinion therein is quite lengthy. The whole graveyard there involved consisted of a rectangle 90 feet wide by about a city block long located in a city. The church, which held the cemetery property *as trustee*, attempted to sell the entire graveyard which entailed the removal of all of the human remains, vaults, coffins, monuments and tombstones, etc. The court, among other things and apparently contrary to the weight of authority, 10 Am. Jur. *Cemeteries*, Section 22, held that the grantees of the cemetery lots there involved received title thereto in fee and granted a preliminary injunction to maintain the *status quo* until the case could be disposed of on plenary pleadings and proofs. In the case at bar, there is no attempt to sell property held in trust, nor to remove any mortal remains, vaults, coffins or other sacred reminders of the dead; the question here involved is one of the use of property, formerly a part of a larger tract owned by a cemetery company, but never utilized for cemetery purposes.

*Decree affirmed, with costs.*